RUFKAHR CONSTRUCTION
COMPANY,
Plaintiff-Respondent,

v.

Fred R. WEBER, Jr., and Ann E. Weber,
the Colonial Bank, Kenneth F. Davis,
Pioneer National Title Insurance Com-
pany, Henry P. Coors, Stephenson Roof-
ing Company and Weyerhaeuser Compa-
ny, Defendants-Appellants.

Nos. 44618, 44666.

Missouri Court of Appeals,
Eastern District,
En Banc.

Sept. 6, 1983.

Godfrey P. Padberg, St. Louis, for defendants-appellants.

Merle L. Silverstein, Clayton, for plaintiff-respondent Rufkahr Construction Co.

Stephen C. Turley, Clayton, for plaintiff-respondent Stephenson Roofing Co.

SNYDER, Judge.

There was a rehearing by the court en banc of an appeal by defendant homeowners, Fred R. Weber, Jr. and Ann E. Weber, and a cross-appeal by the general contractor, Rufkahr Construction Company (Rufkahr), from a judgment of the Circuit Court of St. Louis County in a mechanic's lien case arising out of a contract for the construction of appellants' residence. The judgment is reversed in part, reversed and remanded in part and affirmed in part.

Rufkahr sued Fred R. Weber, Jr. and Ann E. Weber and others for breach of a residential construction contract and for imposition of a mechanic's lien on the residential real estate. The Webers counterclaimed for breach of contract by reason of the alleged failure of Rufkahr to construct the house in a workmanlike manner and on time.

Roofing subcontractor Stephenson Roofing Company (Stephenson) was permitted to intervene as a defendant and joined the Weyerhaeuser Company (Weyerhaeuser) as a third-party defendant. Stephenson also cross-claimed against Rufkahr for the amount alleged to be due on the roofing subcontract. Rufkahr then counterclaimed against Stephenson for any damages awarded to the Webers against Rufkahr because of defects in the roofing.

The trial court rendered judgment: (1) for Rufkahr and against the Webers in the amount of $22,422.34 plus interest on its petition, the amount of the judgment to constitute a mechanic's lien on the residential real estate; (2) for Stephenson and against Rufkahr in the amount of $7,016.99 plus interest on its cross-bill, the amount of the judgment to constitute a mechanic's lien on the residential real estate; (3) for the Webers and against Rufkahr in the amount of $3,100.00 on the Webers' counterclaim; and (4) dismissing as moot Stephenson's third party petition against Weyerhaeuser and Rufkahr's counterclaim against Stephenson.

Appellants Weber raise five points of error. First, they contend that the trial court's finding that respondent and cross-appellant, Rufkahr, substantially performed its obligations under the contract was against the weight of the evidence. Second, appellants charge the trial court improperly admitted parol evidence. Third, they contend "the trial court exceeded its jurisdiction" by denying appellants, on the grounds of laches, estoppel and unclean hands, the remedy of specific performance. Fourth, appellants assert that a mechanic's lien in favor of Rufkahr was erroneously granted because Rufkahr did not comply with the disclosure requirements of § 429.-012(1) RSMo. 1978. Fifth, they contend that a mechanic's lien in favor of intervenor-respondent Stephenson is invalid because Stephenson failed to serve appellants as owners with a ten day written notice of intent to file a mechanic's lien as required by § 429.100 RSMo. 1978.

Respondent Rufkahr raises two allegations of error in its cross-appeal. Rufkahr first maintains that the trial court erroneously awarded appellants $3,100.00 on Count II of appellants' counterclaim because there was no proof of damages. Rufkahr also charges the trial court erred in dismissing its counterclaim against Stephenson because in the event the cause is remanded, the counterclaim against Stephenson ought to be reinstated.

The parties were asked to brief three specific issues for consideration by the en banc court:

(1) Whether the October 25, 1976 letter signed by Marshall R. Ritchie which was an attachment to Exhibit W was received in evidence.

(2) If the Ritchie letter was received is a finding that the specified shingles were applied against the weight of the evidence?

(3) Was the statutory notice of the possibility of a mechanic's lien sufficient when given to the Weber's architect?

## I. THE FACTS

On April 14, 1976 appellants and respondent Rufkahr entered into a contract for the construction of appellants' home by Rufkahr as the general contractor. As increased by subsequent change orders, the total price for the construction of appellants' home was $398,267.60.

The contract included specifications. Among other things, the specifications stated that the architect was the owner's (appellants') representative with authority to act on behalf of appellants to the extent provided in the contract documents. Another contract, the escrow agreement, required all changes from the specifications for the house to be made by written change orders. Construction of the house was to be substantially completed by December 1, 1976. Rufkahr was to pay $100 per diem as liquidated damages for each day beyond December 1 until the day of substantial completion.

A certificate of substantial completion was issued by one of the architects, George Winkler, on November 30, 1976. However, a "punch list" of a number of items which the architect or the owner felt needed to be corrected, was attached to the certificate. A number of the items on the punch list were never satisfactorily corrected or completed according to appellants.

The main dispute centered around whether the proper roofing was installed on the house. The contract called for the roof to be made of Certigrade No. 1 Blue Label shingles, 24″ Royals, 100% heartwood, 100% clear and 100% edge grain. Rufkahr hired Stephenson as a subcontractor to install the roof.

Stephenson ordered the Blue Label shingles from the Weyerhaeuser Company along with some Red Label shingles, which are an inferior grade of wood shingles, the Red Label shingles to be used as undercoursing. The order actually called for "Blue Label" and "Red Label" but did not specify whether shingles or shakes [1] were to be shipped, but Weyerhaeuser invoiced Stephenson for shingles. When the order came in, two employees of Stephenson, John Stephenson and Bill Tomschin, went to pick up the order. Mssrs. Stephenson and Tomschin observed Blue Labels on the bundles of shingles, but did not see any Red Labels. However, nothing more than a casual observation of the shingles was done to confirm that all of the shingles were indeed Certigrade No. 1 Blue Labels.

All the roofing from Weyerhaeuser was installed on the Weber residence by Mssrs. John Stephenson and Tomschin. Neither John Stephenson nor Tomschin had ever worked with Blue Label shingles before roofing the appellants' residence, nor have they worked with that type of shingle since, although Tomschin had been a roofer for twenty-seven years.

Stephenson ran out of shingles after having completed the roof of the main house and the garage, leaving the north slope of the tool house and the roof of the gazebo remaining to be done. Weyerhaeuser Co. could not fill the re-order, so Stephenson ordered the extra shingles from the Superior Lumber Co. The shingles which were placed on the gazebo and north slope of the tool house were thinner than the shingles obtained from Weyerhaeuser.

Much testimony was given as to whether the proper shingles were installed. Mr. Weber was firm in his conviction that the shingles were not Blue Labels. In addition,

---

1. A shake is sawn on one side and split on the other, whereas a shingle is sawn, and consequently smooth, on both sides.

it was the opinion of one of the architects, Mr. Winkler, that 90% of the shingles on the main house were not Blue Labels. The reason given was that the butt ends of the shingles on the house were too thick to be certigrade number one. However, Mr. Winkler admitted that his 90% figure was purely a guess. He could not observe all the shingles because some of the shingles were used as undercoursing and the shingles overlapped each other.

An employee of the Red Cedar Shingle and Handsplit Shake Bureau (Bureau) apparently inspected the roofing. The Bureau grades shingles and shakes and sets standards for the industry. A letter allegedly from the Bureau states that one of the Bureau's representatives inspected the roofing and found that the main house was roofed with No. 2 Tapersawn shakes and the toolhouse and gazebo had No. 1 Royal Shingles. Two copies of the letter are attached to Exhibit W which is a letter from George Winkler, one of the Webers' architects, to Rufkahr. The Winkler letter referred to the letter from the Bureau and informed Rufkahr that the shingles installed did not meet the specifications of the contract. Appellants placed great reliance on Exhibit W and the attached letter from the Bureau as evidence that the shingles installed did not meet the contract specifications. Exhibit W and the Bureau letter were the subject of most of the briefing and oral argument upon rehearing.

Finally, at one point Clifford Rufkahr, president of the Rufkahr Construction Company, stated that the roof was "not the roof the specifications called for." However, this statement is not a clear admission that the shingles were not Blue Labels because the specifications also called for the shingles to be stained black, a specification which was later eliminated.

On the other hand, Mr. Rufkahr later testified that he did not know what type shingle was on the roof. Bryan Stephenson of Stephenson Roofing was likewise unaware of what type shingle was on the roof. George Stephenson, president of Stephenson Roofing, testified that to his knowledge, no shakes were on the roof. John Stephenson was of the belief that sawn wood shingles were installed on the main roof.

The trial court found Mr. Tomschin's testimony particularly impressive. Mr. Tomschin testified that the shingles were smooth, of the same quality, without blemishes, clear, and made of cedar.

The parties also disputed when Rufkahr or Stephenson was given notice that the roofing was wrong. Stephenson's position is that it was not informed of the alleged wrong shingles or shakes until after the job was completed, even though Mr. Weber watched the installation of the roof from the beginning. Rufkahr alleged that the first communication it received that improper shingles were installed came after the roof was substantially completed.

Another item which was not installed to appellants' satisfaction was the metal furring in the basement. Metal furring is a channel attached to masonry walls and onto which drywall is attached. The specifications called for the furring to be attached with screws. Instead, the furring was installed with nails. No written change order was given for the deviation from the specifications.

However, Mr. Thompson, another one of appellants' architects, recommended to Mr. Weber that nails be used instead of screws. A day later, Mr. Rufkahr wrote Mr. Thompson a letter in which the former indicated that it was his understanding that the furring channels were to be installed with nails. These letters were apparently the result of a discussion between Mssrs. Rufkahr, Thompson, Weber and Winkler.

Mr. Thompson did not reply to Rufkahr's letter and Mr. Weber rescinded any possible consent to the change when he demonstrated to Mr. Rufkahr that the metal furrings were not securely attached to the wall by the nails.

A third source of dispute concerns the installation of gas piping. The specifications required all gas piping in concealed areas to be enclosed in conduit. The concealed gas piping was not enclosed in con-

duit. Rufkahr asserts that the requirement concerning the conduit was eliminated by one of the architects, Mr. Thompson. Appellants, however, maintain that the elimination of the conduit was improper because it was not done pursuant to a written change order.

There was also a dispute about the time during construction when a full-time superintendent was no longer required.

On appeal from a judgment in a court tried case, the appellate court will sustain the trial court's decree "... unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32[1–3] (Mo. banc 1976).

## II. THE SUBSTANTIAL PERFORMANCE ISSUES

■ Appellants' first contention is that the trial court erred when it found that Rufkahr substantially performed its part of the construction contract. They say the finding was against the weight of the evidence.

The gas pipe conduit and metal furring defects and the other minor defects complained of by appellant, even though the complaints were well founded, are too unsubstantial, when the magnitude of the job is considered, to justify a finding that the contract was not substantially performed.

Therefore, the dispositive question is whether the specified shingles were installed on the roof of the Webers' house. The trial court found that they were. This court agrees.

## A. JUDICIAL ADMISSIONS

Appellants launch a two-pronged assault on the trial court's finding that the correct shingles were installed on the roof of the Webers' house. First, they contend that both Rufkahr and Stephenson judicially admitted that improper shingles were put on the roof. This contention is without merit.

Stephenson allegedly admitted that the shingles were improper by stating in its third party petition against Weyerhaeuser, "That the roofing materials delivered by third-party defendant were of a substantially lesser quality than those ordered by third-party plaintiff and required by third-party plaintiff's contract with plaintiff Rufkahr Construction Company." This paragraph of the third-party petition does not allege that *if* the wrong shingles were installed, Weyerhaeuser would be liable, but rather is an affirmative statement that the wrong shingles were on the roof. Admissions against interest in a pleading are binding on the pleader so that "[f]acts admitted by the pleader do not have to be proven by his opponent." *Ried v. City of Maplewood*, 598 S.W.2d 171, 173[1] (Mo. App.1980). Stephenson therefore judicially admitted the lack of compliance with the specifications regarding the type of shingle which was to be installed on the roof of the Webers' house.

However, Stephenson's judicial admission offers no assistance to appellants. Appellants' breach of contract action is against Rufkahr, not Stephenson. The question of the effect of Stephenson's admission need not be reached unless Rufkahr otherwise breached its contract with appellants. The judicial admission of Stephenson is not binding on Rufkahr because there is no showing that Stephenson was an agent of Rufkahr with the authority to speak for him. See *Roush v. Alkire Truck Lines, Inc.*, 299 S.W.2d 518, 520–521[5–8] (Mo.1957). Thus, unless Rufkahr judicially admitted that the shingles were improper or the trial court's finding that the correct shingles were installed was clearly erroneous, Stephenson's admission will be harmless.

Appellants assert that Rufkahr's counsel did in fact judicially admit that the improper shingles were installed when Rufkahr's counsel said in his opening statement:

There was a construction contract to build a residence for Mr. and Mrs. Weber. Mr. and Mrs. Weber then filed a counterclaim against Plaintiff as general contractor claiming a number of defects.

But, I think primarily the wrong roof was put on the house, that # 2 shingles were put on when specifications called for # 1 shingles.

Appellants maintain that the last sentence is a judicial admission that the wrong roof was installed.

When taken out of context, the last quoted sentence could be interpreted as an admission that the wrong shingles were installed on the roof. However, when read in the context of the whole paragraph, the alleged admission is merely a recitation of the contentions of appellants, rather than a factual statement of counsel.

The conclusion that the remarks were not admissions is buttressed if one reads the opening remarks of Rufkahr's counsel: "It might be helpful to the Court if I made about a two or three minute opening statement just to give the Court the positions of the parties and not going into evidentiary facts."

Moreover, appellants could not have been surprised that the question of whether the shingles were proper was tried. Appellants had requested that Rufkahr admit that the incorrect shingles were installed and that the roofing was not installed in a workmanlike manner. Rufkahr denied both requests for admissions. Rufkahr's counsel did not make a judicial admission. Therefore, whether the specified shingles were installed was an issue tried before the trial court.

## B. AGAINST THE WEIGHT OF THE EVIDENCE

The second prong of appellants' assault on the trial court's finding that the correct shingles were on the roof is their charge that the finding was against the weight of the evidence. There was substantial evidence to support the trial court's finding and the finding was not against the weight of the evidence. "Appellate courts should exercise the power to set aside a decree or judgment on the ground that it is 'against the weight of the evidence' with caution and with a firm belief that the decree or judgment is wrong." *Murphy v. Carron,* 536 S.W.2d at 32[1–3].

None of the witnesses had ever worked with Blue Label shingles before, and none have worked with that type of shingle since. Most of the witnesses had no knowledge of what shingle was actually installed on the roof. Only Mssrs. Weber and Winkler testified that the roofing material was not Certigrade No. 1 Blue Label shingles. The observations of the roof by Weber and Winkler were made either from the ground or the second story windows.

On the other hand, John Stephenson and Bill Tomschin testified that when they took delivery of the shingles from Weyerhaeuser, they saw only Blue Labels on the shingle packages. Neither John Stephenson nor Tomschin made more than a casual observation that the shingles were Blue Labels at the time they took delivery at the Weber warehouse. Tomschin, however, a roofer with twenty-seven years experience, testified that he installed shingles, as opposed to shakes, which were clear and without blemish. The trial court was impressed with Tomschin's testimony.

There was testimony that the shingles which were applied were too thick at the butt end and Tomschin said the shingles on the main house were thicker at the butt end than those on the roof of the gazebo, a separate small building. Blue Label shingles were said to be thinner shingles at the butt end than inferior grades. But the specifications in evidence did not state what thickness Blue Label shingles were supposed to be, and no one who testified was sure of the limits within which the butt end thickness of a shingle would have to fall in order to be a Blue Label.

Thus, the testimony of John Stephenson and Bill Tomschin support a finding that the roofing material was Blue Label. The further testimony of Tomschin that shingles and not shakes were installed on the roof supports a finding that Blue Label shingles were applied. Tomschin said the shingles were smooth, of the same quality, without blemishes, clear, and made of cedar. Weyerhaeuser invoiced Stephenson and Stephenson paid for Blue Label shingles.

The trial court relied on Tomschin's testimony. Neither Mr. Weber nor Mr. Winkler were experts and their observations were made either from the ground or a second story window. No detailed testimony about the shingles was given by either Weber or Winkler. Appellants assert, however, that the letter signed by Marshall R. Ritchie, Marketing Manager of the Bureau, conclusively establishes that the improper shingles were installed on the roof of the main house.[2]

The first question is whether the letter, for which no independent foundation was laid, was received in evidence as an attachment to Exhibit W. Both Rufkahr and Stephenson contend that Exhibit W was a one page exhibit and that the letter from the Bureau was somehow attached to Exhibit W, perhaps after the one page exhibit was received in evidence. This court does not agree.

Although no one referred to Exhibit W as containing more than one page until after the exhibit was received in evidence, the exhibit was subsequently referred to as containing the letter from the Bureau and appellant's counsel inquired about the Bureau letter without an objection that the letter was not in evidence.

█ Furthermore, no objection was made to this court when Exhibit W was filed here with the attachments. When one page of an exhibit refers to an attached page, the introduction of the first page in evidence carries with it the second page, unless an objection is made as to the attached page. See *Knoche v. Perry,* 90 Mo. App. 483, 487–488 (1901). The letter from the Bureau was therefore received in evidence.

█ The second issue regarding the disputed letter is whether it is entitled to any probative value. The letter purports to be the statement of Marshall R. Ritchie who writes that Bureau field representative Hugh Loth was of the opinion that the incorrect roof was installed on the main house. The letter is double hearsay admission of which would have been refused on proper and timely objection. No testimony was taken of either Mr. Ritchie or Mr. Loth. The qualifications of Mr. Loth and the basis for his opinion were never subjected to cross-examination. The trial court repeatedly sustained objections to questions seeking to elicit evidence of the content of the Bureau letter. It has at best minimal evidentiary weight.

After considering all the evidence, including the letter from the Bureau, this court cannot say that the trial court's finding that Rufkahr substantially performed the contract was against the weight of the evidence.

### III. PAROL EVIDENCE

Next, appellants assert that certain testimony should have been excluded as parol evidence. Appellants object to testimony by Mr. Rufkahr regarding a discussion between himself and the architects about whether a full-time superintendent was necessary throughout the construction and whether gas piping in concealed areas needed to be enclosed in conduit. The contract expressly required a full-time superintendent and conduit around the concealed gas piping.

Respondent Rufkahr, however, maintains that the admission of the conversations is not barred by the parol evidence rule because the discussion concerning the full-time superintendent merely implemented the contract rather than modifying it and the conversation regarding the gas pipe conduit was subsequent to rather than contemporaneous with the written agreement.

2. The body of the letter reads:
"Our field representative, Mr. Hugh Loth, reports to us that in his judgment the material on the roof of the Fred Weber, Jr. residence Lot 3, Indian Creek Lane, St. Louis, Missouri is *No. 2 Tapersawn shakes.*

Mr. Loth further states that the tool house and gazebo are roofed with *No. 1 Royal shingles.*
We trust that this report proves helpful."

■ The first issue is whether the written agreement was integrated. Restatement, Contracts (2d) § 209(2). If the agreement is not integrated, the parol evidence rule has no application. *Goodspeed v. Grand National Bank,* 46 S.W.2d 913, 914[4, 5] (Mo.App.1932); 4 Williston on Contracts, Third Edition § 636. Article 8, section 2 of the "Standard Form of Agreement Between Owner and Contractor" states that the contract documents, which are set forth, constitute the entire agreement between the parties. The contract documents are an integrated agreement.

### A. THE FULL TIME SUPERINTENDENT

■ The parol evidence rule bars the consideration of evidence of oral agreements made prior to, or contemporaneous with, the written contract which vary the terms of the written agreement. *Chandler v. Rosewin Coats, Inc.,* 515 S.W.2d 184, 188 (Mo. App.1974). Respondent Rufkahr concedes that the conversation between Mr. Rufkahr and Mr. Weber regarding the length of time for which a full-time superintendent would be needed on the job was contemporaneous with the execution of the written agreement.

■ The issue with regard to the conversation concerning the full-time superintendent is whether the oral agreement varies the terms of the written agreement.

No parol evidence that is offered can be said to vary or contradict a writing until by process of interpretation it is determined what the writing means. The 'parol evidence rule' is not, and does not purport to be, a rule of interpretation or a rule as to the admission of evidence for the purpose of interpretation. Even if a written document has been assented to as the complete and accurate integration of the terms of a contract, it must still be interpreted; and all those factors that are of assistance in this process may be proved by oral testimony.

3 Corbin on Contracts § 579 (1960). Thus, admission of oral testimony for the purpose of interpreting the contract does not violate the parol evidence rule. Evidence of agreements or negotiation prior to or contemporaneous with the execution of written agreement are admissible to establish the meaning of the written contract. *Fisher v. Miceli,* 291 S.W.2d 845, 848[3–5] (Mo.1956); *Fabick Brothers Equipment Co. v. Leroux,* 375 S.W.2d 887, 890[1] (Mo.App.1964); Restatement, Second, Contracts, § 214(c).

■ The issue narrows to whether the oral agreement between Mr. Rufkahr and Mr. Weber concerning the time during which a full-time supervisor would be needed is an interpretation of the terms contained in the contract documents. The contract provision relating to the need for a full-time superintendent is set forth as follows:

In addition to his own superintendence and administration, the Contractor shall employ a qualified superintendent, acceptable to the Owner and the Architect, who shall represent the Contractor and shall perform and exercise superintendence of all work on the site. The superintendent shall be on site full time on all working days *until such time as the Owner and the Contractor shall agree that full-time superintendence is no longer required,* and shall then perform and exercise the necessary part-time superintendence until work is completed. Generally, full-time superintendence shall be exercised until all layout work has been done, framing and rough-in mechanical and electrical systems completed, and exterior and interior facing materials have been applied. (Emphasis supplied).

The substance of the conversation regarding the full-time supervisor was related to the court by Mr. Rufkahr as follows:

Fred [Weber] was of the opinion a full-time supervisor was not a necessity, so we negotiated the period of time that the full-time superintendent would be on the job. This was determined to be to the point of drywalling the house and the amount of ten thousand dollars as set aside to pay for that period of time.

The written agreement states that a full-time superintendent will be necessary until such time as Mr. Weber and Mr. Rufkahr agree that one would no longer be necessary. The time at which full-time superintendence shall cease is not set forth exactly in the contract, although the contract states "generally" when full-time superintendence will be required. Therefore, parol evidence is permissible to interpret the contract to determine the exact time when the parties believed that full-time superintendence would no longer be required. Thus, the testimony that Mr. Weber, Mr. Rufkahr and Mr. Thompson orally agreed that full-time superintendence would not be necessary after the drywalling is relevant and admissible as an interpretation of the contract. The appellants' complaint about this parol evidence is not well founded.

## B. THE CONCEALED GAS PIPE CONDUIT

■ The conversations about the concealed gas pipe conduit pose a slightly different problem. The trial court did not mention the gas pipe conduit or damages therefor in its judgment. The alleged oral agreement between Mr. Rufkahr and the architects that conduit would not be necessary directly contradicts the provision in the specifications requiring conduit around gas pipes in concealed areas. However, the oral agreement was subsequent to the execution of the written documents. ". . . [A] written contract may be modified by subsequent parol agreement." *Tighe v. Locke,* 299 S.W. 105, 110[5] (Mo.App.1926); Calamari, John D. and Perillo, Joseph M., The Law of Contracts, § 3.2 (2d Ed.1977). Thus, without more, the admission of the oral agreement eliminating the conduit would not violate the parol evidence rule. But there is something more.

The escrow agreement, signed by Rufkahr and the Webers, states that the con-

tractor "covenants and agrees" not to permit any changes to the specification without the written approval of the owner, mortgagee and escrowee.[3] The first issue is whether the subsequent parol agreement can be given effect in light of the express provision in the contract requiring changes to be in writing. The rule is that a subsequent parol agreement which varies or alters the written contract between the parties may be given effect despite the existence of an express provision in the written contract which requires all changes to be in writing. *Fritts v. Cloud Oak Flooring Co.,* 478 S.W.2d 8, 13–14[4, 5] (Mo.App.1972); 3A Corbin on Contracts § 763 (1960).

The case under review is distinguishable from *Fritts v. Cloud Oak Flooring Co.* in that here the subsequent parol agreement was between Mr. Rufkahr and the *architects,* rather than between Mr. Rufkahr and the Webers, whereas *Fritts* involved an issue of waiver by a party to the contract. The question in the case at bar thus becomes an inquiry into the scope of the architects' authority. See 3A Corbin on Contracts § 763 (1960).

■ The architects were the Webers' agents. The power of the architects included the authority to interpret the requirements of the contract documents provided that their interpretations were consistent with the contract documents. In addition, the architects had the authority to order minor changes, if such changes were accomplished by field order or other written order and consistent with the contract documents. One of the characteristics of a field order is that it is written.

The agreement between Mr. Rufkahr and the architects was not in writing; therefore, it does not fall within the scope of the agent's authority to order minor changes. The agent's authority to interpret the contract documents was subject to the require-

---

**3.** The "Standard Form of Agreement," Ex. 1, does not refer to the escrow agreement as a contract document. None of the parties has addressed the question of whether the escrow agreement is parol evidence. However, this court's independent examination reveals that consideration of the terms of the escrow agreement would not violate the parol evidence rule because the escrow agreement was entered into subsequent to the execution of the Standard Form of Agreement.

ment that such authority be exercised consistently with the intent of the contract documents. The parol agreement on conduit for concealed gas piping was not in any way consistent with the intent of the contract documents when the specifications required all gas piping in concealed areas to be enclosed by conduit.

Respondent Rufkahr correctly points out that the specification did not specify the materials of which the conduit was to be made; however, the parol agreement did not relate to the material, but instead eliminated the gas piping conduit altogether. Therefore, the parol evidence concerning the lack of need for conduit for the gas piping should not have been allowed and the Webers should have been allowed damages for this defect in performance.

## IV. LACHES, ESTOPPEL, UNCLEAN HANDS

■ In appellants' third point of error they contend the trial court ought not to have denied appellants' claim for specific performance on the grounds of laches, estoppel, and unclean hands because these grounds constituted affirmative defenses which were not pled. The finding that respondent Rufkahr substantially performed the contract makes it unnecessary to rule on this point.

Nevertheless, this court has considered appellants' contention that the defenses of laches, estoppel and unclean hands were not properly before the trial court and finds the

contention is without merit. Substantial evidence was adduced regarding Mr. Weber's constant observation of the allegedly defective roof during construction and his failure to register any objection. Appellants did not object to the introduction of the evidence on the grounds that it was irrelevant or outside the scope of the pleadings. The defenses of laches, estoppel and unclean hands were therefore tried by consent. Rule 55.33(b).

## V. THE RUFKAHR MECHANIC'S LIEN

■ The next point raised by appellants questioned the trial court's granting of a mechanic's lien in favor of respondent Rufkahr and against the Weber residential property. This court, in its original opinion, affirmed that part of the judgment granting the lien. Appellants emphasized this point in their motion for rehearing. The court en banc, after a thorough review of the facts and law, finds that the lien should not have been granted.

Appellants assert that the trial court erred in granting respondent Rufkahr a mechanic's lien because Rufkahr failed to comply with the notice provisions of § 429.-012(1) RSMo.1978 [4] which requires original contractors to disclose to the person with whom the contract was made the possibility of the filing of mechanic's liens by material suppliers and workmen. Notice was given when the first five payment vouchers were

---

4. Section 429.012(1) reads in part:
"429.012. Original contractor to have lien, when—notice required, form of—penalty for failure to notify.—1. Every original contractor, who shall do or perform any work or labor upon, or furnish any material, fixtures, engine, boiler or machinery for any building, erection or improvements upon land, or for repairing the same, under or by virtue of any contract, shall provide to the person with whom the contract is made prior to receiving payment in any form of any kind from said person, (a) either at the time of the execution of the contract, (b) when the materials are delivered, (c) when the work is commenced, or (d) delivered with first invoice, a written notice which shall include the following disclosure language in ten point bold type:

NOTICE TO OWNER
FAILURE OF THIS CONTRACTOR TO PAY THOSE PERSONS SUPPLYING MATERIAL OR SERVICES TO COMPLETE THIS CONTRACT CAN RESULT IN THE FILING OF A MECHANIC'S LIEN ON THE PROPERTY WHICH IS THE SUBJECT OF THIS CONTRACT PURSUANT TO CHAPTER 429, RSMo. TO AVOID THIS RESULT YOU MAY ASK THIS CONTRACTOR FOR 'LIEN WAIVERS' FROM ALL PERSONS SUPPLYING MATERIAL OR SERVICES FOR THE WORK DESCRIBED IN THIS CONTRACT. FAILURE TO SECURE LIEN WAIVERS MAY RESULT IN YOUR PAYING FOR LABOR AND MATERIAL TWICE."

submitted to the architect. Notice was never given directly to the Webers.

The first five payment vouchers were submitted to the architects for approval in one group. Only voucher number five, however, contained the required statutory disclosure language. It is unimportant whether the notice appeared on the first or the fifth voucher under the circumstances because the lien must be set aside for failure to notify appellants directly.

Respondent Rufkahr bears the burden of demonstrating compliance with the notice requirements of § 429.012(1). See *R.J. Stephens Drywall and Painting Co. v. Taylor-Morley-Simon, Inc.*, 628 S.W.2d 374, 375[2] (Mo.App.1982). That burden has not been met.

█ Appellants' principal argument is that respondent Rufkahr failed to provide notice to the "... person with whom the contract is made ..." § 429.012(1), because the vouchers containing the notice of lien were delivered to the architects rather than the Webers, the contracting parties. The notice was indeed inadequate.

The architects were appellants' agents for receiving and approving vouchers. In addition, appellants gave the architects the power to interpret the contract documents, to authorize minor unwritten changes, and to determine whether Rufkahr had substantially performed its obligations under the contract. Nowhere, however, were the architects given express authority to receive mechanic's lien notices.

The issue is whether this court will imply an agent's authority to receive mechanic's lien notices which by statute must be sent to the agent's principal. "The ... purpose of notice to an owner ... is to warn that laborers and suppliers remain who may be unpaid and so allow the owner opportunity to discharge the debt before the lien is claimed." *Structo Corp. v. Leverage Investment Enterprises, Ltd.*, 613 S.W.2d 197, 201–202[10, 11] (Mo.App.1981). Where, as here, the contract documents do not indicate that the owners, the Webers, knew either of the possibility that laborers and suppliers might remain who were unpaid or that they were entitled to the statutory notice, an implication that the owners had designated the architects as agents for receipt of the mechanic's lien notice would frustrate the purpose of § 429.012 RSMo. 1978.

The possibility that the owners, the very persons whom the statute was intended to benefit, might be unaware of their legal position, causes this court to hold that the authority of an agent to receive the mechanic's lien notice required in § 429.012(1) will not be implied here. Therefore, the mechanic's lien in favor of Rufkahr should not have been granted.

## VI. THE STEPHENSON MECHANIC'S LIEN

█ Appellants' final point relied on charges the trial court erred in awarding respondent Stephenson a mechanic's lien because Stephenson failed to prove that it gave the Webers notice of its intent to file ten days prior to filing its mechanic's lien as required by § 429.100 RSMo.1978. The only proof that Stephenson gave appellants ten days advance notice was George Stephenson's testimony that his attorneys told him the notice was given, hearsay testimony to which the trial court sustained an objection.

Where the only proof of service of notice of intent to file a lien was an unsworn certificate to that effect signed only by the subcontractor's attorney, it was held that such proof was insufficient to establish service of the notice. *Towner v. Remick,* 19 Mo.App. 205, 209 (1885). The proof in the instant case is even more unreliable than that offered in *Towner v. Remick* because here only hearsay testimony was offered— not even the attorney's own statement that notice was given is in the record.

The proof in the case at bar is insufficient to establish the statutory notice. Nor is there any proof that appellants were actually served or that constructive notice under § 429.110 RSMo.1978 was proper. See *Sentinel Woodtreating, Inc. v. Cascade Development Corp.,* 599 S.W.2d 268, 270[4–

6] (Mo.App.1980). Therefore, the mechanic's lien in favor of Stephenson Roofing Co. is invalid.

Respondent Stephenson Roofing Co., however, claims that the issue is moot because sufficient funds are in escrow to pay any judgment that might be rendered in its favor. It is also claimed that the mechanic's lien is no more a cloud on appellants' title than the underlying judgment.

There are three reasons why this court does not choose to hold that the question of the validity of Stephenson's mechanic's lien is moot. First, for purposes of priority, the lien of the judgment would not relate back to the time of the commencement of the work on the building as would the mechanic's lien. Cf. *United Lumber Co. v. Minmar. Inv. Co.*, 472 S.W.2d 630, 632[1] (Mo.App. 1971) with *Pruellage v. DeSeaton Corp.*, 407 S.W.2d 36, 39[1, 2] (Mo.App.1966). Second, if subsequent to this opinion it were to happen that insufficient funds were available in escrow to satisfy Stephenson's judgment, it would be manifestly unjust for Stephenson to foreclose on its "moot" mechanic's lien. Third, the question of mootness is a double-edged sword. If sufficient funds are in escrow, Stephenson will not be affected by this court's ruling on the merits of its mechanic's lien.

## VII. THE RUFKAHR CROSS–APPEAL

■ Respondent Rufkahr raises two points in its cross-appeal. First, it is claimed that the trial court erred in awarding appellants $3,100.00 on the latter's counterclaim because there was insufficient proof of the damages. The trial court awarded three thousand dollars to appellants because of the installation of the metal furring with nails instead of screws. In addition, one hundred dollars was given to appellants to compensate them for "hardware and hinges purchased."

Rufkahr concedes the correctness of the trial court's findings that nails were used to attach the metal furring instead of screws, that the substitution was not authorized, and that the Webers purchased hardware and hinges which should have been purchased by the contractor. Rufkahr contends, though, and this court agrees, that not a scintilla of evidence can be found in the record which supports the amount awarded to appellants due to the failure to use screws instead of nails to attach the metal furring.

In the ordinary action for damages, the plaintiff has the burden of proving a submissible case by adducing substantial evidence of probative value or by inferences reasonably drawn therefrom.... The concept of a 'submissible case' contemplates the establishment of a cause of action by such evidence or inference, and a total failure of proof as to any one element of the cause of action constitutes a missing link breaking the chain of facts, the completion of which is necessary to an assessment of liability.

*Estate of Zeppenfeld*, 593 S.W.2d 890, 893[4–6] (Mo.App.1979).

Weber also testified that he had replaced broken and missing glass in a light fixture and a post light for "approximately" fifty dollars and spent about the same amount for a hinge. His testimony on these items was uncertain and not exact in amount.

The judgment on appellants' counterclaim must be reversed and remanded because of the metal furring question. Upon retrial, evidence should be received on the damages suffered by appellants because of the metal furring defect and the exact amount spent by appellants for hardware, hinges and light fixture glass.

Respondent Rufkahr's second point is that in the event that this court should rule that the trial court's finding that the correct shingles were installed was against the weight of the evidence, respondent Rufkahr's counterclaim against Stephenson Roofing Co. should be reinstated. The point need not be addressed because this court has upheld the trial court's finding on the question of the shingles.

Appellants also charge that several other defects in construction should bar a finding that Rufkahr substantially performed the contract. However, the evidence supports a

finding of substantial performance by Rufkahr.

The judgment for $3,100.00 in favor of appellants and against Rufkahr is reversed and remanded for determination of the amount of damages sustained by appellants because of the diminution in the value of the house due to the failure to install the metal furring with screws and because of the exact amounts spent by appellants for hardware, hinges and light fixture glass. In addition, the trial court shall determine the amount of damages sustained by appellants because of the failure to enclose the gas piping in conduit. The trial court shall then render judgment in favor of appellants and against respondents in the total amount so determined.

Those portions of the judgment imposing a mechanic's lien in favor of Stephenson Roofing Company and in favor of Rufkahr Construction Company against the residential real estate of the Webers are also reversed.

In all other respects, the judgment is affirmed.

STEWART, C.J., REINHARD, CRIST, SIMON and CRANDALL, JJ., and LACKLAND H. BLOOM, Special Judge, concur.

DOWD, C.J., dissents.

PUDLOWSKI, J., dissents in parts II, IIIA, IV and VII, and concurs in parts IIIB, V and VI.

DOWD, Chief Judge, dissenting.

I concur with the majority in all respects with the exception of Point II from which I respectfully dissent. I believe the record reflects insufficient evidence for us to find that the trial court's judgment was supported by substantial evidence.

Our standard of review is clear and generally we will not set aside the decree or judgment of the trial court unless there is no substantial evidence to support it, or unless it is against the weight of the evidence. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

The majority opinion relies heavily on John Stephenson's and Bill Tomschin's testimony that they saw only blue labels on the shingle packages, that Tomschin had installed shingles and not shakes, and that the shingles he noticed were smooth and unblemished. Stephenson, however, also acknowledged there was a difference in the final order of shingles from those installed earlier. Furthermore, the evidence revealed Tomschin had no prior experience with Certigrade # 1 Blue Label Shingles, that he had never before installed a shingle roof, and that he did not know the shingles contracted for were to be 100% heartwood, 100% clear, and 100% edge grain. Tomschin also testified he never measured the butt end thickness of the shingles, thickness being a major difference between # 1 Blue Labels and lesser grade shingles. While Tomschin testified he saw Blue Labels on the shingles, he had no idea how many were in fact Blue Labels and also admitted he simply applied the roof that was on the truck.

The court's reliance on the testimony of a witness who was totally unfamiliar with # 1 Blue grade shingles is misplaced where both the architect and the owner who had specifically ordered this type of shingle testified that the improper shingles were in fact applied. The architect, Mr. Winkler, testified that in his opinion 90% of the shingles on the main house were not Blue Labels because the butt ends of the shingles on the house were too thick to be certigrade number one. He also noticed there was some warping or bowing and splitting of some of the shingles, which is also an indication of lesser grade shingles. While the majority opinion is correct that Mr. Winkler stated that his 90% figure was purely a guess, a closer reading of the transcript reveals this to be an educated judgment based on the shingles he could observe and the number of squares in the roof. Winkler testified he observed the shingles from the windows of the second floor and from the ground. The fact that Winkler stated his estimate was a guess should not discredit his testimony when he was more familiar with Certigrade # 1 Blue Labels than the

roofers themselves. Winkler was asked to simply give an estimate based on what he had observed, and what is an estimate but an approximation or a "guess". I do not believe that semantics should play a role in the decisions of this court.

I would also note that Clifford Rufkahr himself admitted that the roof installed was not the roof the specifications called for. The majority contends "this statement is not a clear admission that the shingles were not Blue Labels because the specifications also called for the shingles to be stained black, a specification later eliminated." I disagree and believe this is in fact a clear admission that the improper shingles were applied. The discussion prior to Rufkahr's admission concerned only the size, texture, and grade of the shingles. The specifications calling for the shingles to be stained black was eliminated and the Weber's given a credit. When Rufkahr was asked if the roof was according to specifications, he could only have been referring to the grade of shingles and not the color. He stated that the roof was intact and served its purpose and then went on to state it was not according to specifications. I cannot believe that Rufkahr at trial, would refer to a specification that no longer existed.

I also believe the trial court's finding was against the weight of the evidence. Exhibit W, a report from the Red Cedar Shingle and Hand Split Shake Bureau provides the most concrete evidence that the improper shingles were applied. The letter reads in pertinent part:

> "Our field representative, Mr. Hugh Loth, reports to us that in his judgment the material on the roof of the Fred Weber, Jr. residence Lot 3, Indian Creek Lane, St. Louis, Missouri is *No. 2 Tapersawn shakes.*
>
> Mr. Loth further states that the tool house and gazebo are roofed with *No. 1 Royal shingles.*
>
> We trust that this report proves helpful."

The majority opinion affords this evidence very little, if any weight, because if objected to it would have been inadmissible as double hearsay. Nevertheless, the letter was received without objection and clearly states that the incorrect shingles were applied. I do not believe we can simply ignore this letter and the evidence heretofore set forth, and say the trial court's finding was supported by substantial evidence and was not against the weight of the evidence.

Accordingly, I would find against Rufkahr and would reverse the trial court's finding that Rufkahr substantially complied with the contract.