Charles WULFING, Respondent,

v.

KANSAS CITY SOUTHERN
INDUSTRIES, INC.,
Appellant.

No. WD 45284.

Missouri Court of Appeals,
Western District.

Nov. 3, 1992.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Dec. 22, 1992.

**138**

William T. Smith, III, John K. Power, Melody L. Nashan of Watson, Ess, Marshall & Enggas, Kansas City, for appellant.

Craig S. O'Dear, Gretchen Hunter, Phillip G. Greenfield, of Bryan Cave, Kansas City, for respondent.

Before SHANGLER, P.J., and KENNEDY and SMART, JJ.

SHANGLER, Presiding Judge.

This is an action for breach of contract brought by Charles Wulfing against Kansas City Southern Industries, Inc. [KCSI]. Wulfing claimed that KCSI breached the put[1] agreement of June 21, 1985, by not causing LDX Group to file "as expeditiously as possible" a registration statement with the SEC so as to permit public sale of Wulfing's LDX Group shares. A jury found the issue in favor of Wulfing and awarded $261,920 in damages. The trial court entered judgment on the jury verdict and for $17,575.35 in costs and, thereafter, $74,647.20 for prejudgment interest. The judgment for Wulfing as finally rendered was for $354,142.55. This appeal by KCSI followed.

Wulfing and KCSI, along with several other principals later introduced, were shareholders in a corporation known as LDX Group, Inc. [LDX Group]. Some explanation of the history of LDX Group, the actors and the incidents of the dispute is needed to understand how this case came about.

### History of LDX Group, Inc.

In the early 1980s the Federal Communications Commission decided to deregulate the telecommunications industry. Up until then AT & T enjoyed a monopoly in long distance telephone service. The effect of deregulation was to allow competition. James D. Barnard saw the opportunity and decided to become a competitor, and in 1982 formed LDX, Inc.[2] Barnard had become an expert in telecommunications through his ownership of Telcom Engineering, Inc., a business that provided services to telecommunications businesses. Barnard brought in Charles Wulfing, a friend with knowledge of investment banking as chief financial officer to help finance the new company.

LDX, Inc. became a long distance reseller. It leased Watts line service from AT & T on a volume basis for a volume discount and resold the service to the public. AT & T nevertheless continued to own the transmission facilities.

In 1983, Landon Rowland, president of KCSI, proposed to Barnard that KCSI combine its telecommunication interests with Barnard's companies to form a new holding company, LDX Group, with Barnard as manager.[3] Barnard accepted and operated LDX Group as a company completely separate from KCSI with its own set of directors. Following formation, the approxi-

---

1. "[A] 'put' has been defined as a negotiable option contract giving the bearer the right to deliver to the writer of the contract a certain number of shares of a particular stock at a fixed price on or before a certain date." 12A W. FLETCHER, CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5575.1 (Perm. ed. 1984).

2. LDX, Inc. is a different entity than LDX Group. LDX, Inc. was formed by Barnard with $800,000 of his own money. Later, Robert Sni-

der, William Deramus [then KCSI chairman] and KCSI became investors in LDX, Inc. LDX Group, the opinion explains, was formed as a holding company with LDX, Inc. as one of its owned assets.

3. KCSI contributed to the combination Mid America TV, VEALS, Direct Broadcast Satellite Corporation and International Satellite, Inc. Barnard contributed LDX, Inc. and Telcom Engineering, Inc.

mate distribution of LDX Group stock was 74% to KCSI, 12.4% to Barnard, and 8.99% to other Telcom and LDX employees [including Charles Wulfing].[4] The original board of directors of LDX Group was comprised of KCSI president Landon Rowland, KCSI director John Hawkinson, KCSI chairman William Deramus, and three minority shareholders, Barnard, Wulfing and Snider. KCSI's ownership in LDX Group increased from 74% in 1983 to 80% in 1985 to 93% in 1990.

In early 1984 a new technology appeared in the field of telecommunications, fiber optics. In that technology light waves replaced electronic impulses as the means of voice and data transmission. This allowed a practically infinite volume of telephone and data traffic compared to the limited capacity of the existing microwave technology. To LDX this meant that it would no longer have to depend upon the AT & T lines. However, to install a fiber optics network for long distance transmission would entail a very heavy capital investment. A plan to build a fiber optics cable network from Missouri through Oklahoma into Texas and Louisiana, for the most part on the Kansas City Southern Railway right of way, was presented to the board of directors. The board of directors, including KCSI chairman Deramus, president Rowland and director Hawkinson, gave it unanimous approval.

In order to meet the intensive need for capital the new investment would require, and to avoid distractions to management, LDX Group sold off its subsidiary operations for cash, except for LDX, Inc. LDX, Inc. then merged with Lexitel, another long distance company, and Lexitel, as the result of another merger, became ALC Corporation.

In 1984, KCSI formed LDX Net as a subsidiary of LDX Group to construct and operate the fiber optic communications network.[5] From inception, LDX Net incurred substantial planned operating losses which were the result of investment in the construction of the fiber optic network and the start-up costs necessary to build the business. The company was on plan for achieving profitability in 1987. However, rock was encountered in the construction of the underground network and the revenues were not as projected so that the estimated cost of 35 to 40 million dollars for the project was greatly overrun. The construction of the network was completed in 1986.

As a result, during 1984, 1985 and 1986 LDX Net used up large amounts of cash. In 1985, a $100,000,000 line of credit was negotiated. Its purpose was to pay off a $40,000,000 bank loan, to provide $50,000,000 to complete the network, and for $10,000,000 to fund the transition to a cash break-even operation. Even after the new loan, and construction still not completed, another $50,000,000 was needed, but LDX Group could not find a bank lender. In order to meet its obligations, beginning in 1986 LDX Group began borrowing large amounts from KCSI. By the end of 1986, LDX Group's debt was $143,000,000 [90 million dollars from banks and 53 million dollars from KCSI]. In 1987, LDX Group risked default under the terms of their bank loans if it incurred further debt, even subordinated debt to KCSI. As a result the next $22,000,000 infused by KCSI was in exchange for preferred stock. By July of 1987, LDX Net's total debt was in excess of $150,000,000.

In 1984 some employees of a LDX Group subsidiary, which had been sold off to finance the LDX Net venture, sold their LDX Group shares to a group of Florida investors represented by Dick Williams [the Florida/Williams Group]. Williams began making demands for access to LDX Group/Net proprietary information. KCSI refused these demands, and the Flori-

**4.** Plaintiff Charles Wulfing purchased 300 shares of Telcom Engineering, Inc. and 225 shares of LDX, Inc. in 1983 for $82,500. When LDX Group was formed, Wulfing exchanged his Telcom and LDX, Inc. shares for 2,332 shares of LDX Group. He also became chief financial officer of LDX Group.

**5.** LDX Group in effect came to consist of the ownership of LDX Net and 16% of the shares of ALC Corporation. The interest in ALC is what remained of LDX, Inc.

da/Williams Group threatened litigation. This episode prompted KCSI to take steps to avoid the sale of any additional LDX Group shares to outsiders, such as the Florida/Williams Group.

On June 25, 1985, at the instance of KCSI a proposed Letter Agreement was sent to all LDX Group minority shareholders, optionholders and warrantholders. Wulfing signed the Letter Agreement. The purpose of the proposed Letter Agreement, to avoid the sale of any additional LDX Group shares to outsiders, was accomplished by the inclusion of a right of first refusal. That provision gave KCSI a 30 day option to match any third party offer to purchase LDX Group shares. The right of first refusal discouraged offers from third parties and so effectively restricted the marketability of the LDX Group stock. The inducement of the shareholder to the agreement was a put provision whereby KCSI agreed to purchase the shares at fair market value or cause LDX Group to file a registration statement with the SEC so as to permit public sale of the shares upon written notice by the shareholder to KCSI.[6]

The obligation of KCSI to act under the put provision and whether KCSI acted in accordance with that obligation are at the center of the dispute between Wulfing and KCSI.

Barnard did not sign the Letter Agreement until September 1987 because he had another agreement, an oral put agreement with KCSI president Rowland. In January of 1985, KCSI paid Barnard $1,689,600, or $100 per share, for his 16,896 shares of LDX Group. With this purchase, KCSI owned over 80% of LDX Group and could consolidate the LDX Group and KCSI tax returns and use the LDX Group losses to offset taxable income and gains of KCSI and its other subsidiaries.

In December of 1985, the Florida/Williams Group exercised their put rights under the Letter Agreement and notified KCSI of their intent to sell their LDX Group shares according to the terms of the agreement. KCSI purchased the LDX Group stock for $145 per share.[7] It was the testimony of James Dehner, vice-president of the KCSI holding company and president of LDX Group, that this purchase was made for two reasons. The first was "to get rid of the aggravation of the Florida group." The second was to retain 80% ownership of LDX Group for tax purposes because the LDX Group board had promised key managers and officers that they would be granted options in early 1986.

In early 1986, before completion of the fiber optic network, KCSI board chairman Deramus and president Rowland informed Barnard that KCSI had decided on a change of direction that would affect LDX Group. KCSI wanted to purchase Southern Pacific Railroad and the cost was $1.2 billion. In order to accomplish the acquisition, they asked Barnard to find a merger partner who could fund the LDX Net investment and free KCSI to commit its financial resources to the Southern Pacific purchase.

In early 1987, Barnard began discussions with WilTel, a large telecommunications company owned by The Williams Companies [TWC]. In order to induce the cooperation of the LDX Group management team [who were also LDX Group minority shareholders], Deramus and Rowland assured Barnard that all the minority shareholders would be bought out should the WilTel merger succeed. To accomplish that end, the LDX Group board instructed Barnard to pursue a merger between LDX Group and WilTel with KCSI to retain a 30 to 40% stake in the combined entity. Representatives of the parent companies, KCSI and

---

6. Paragraph (1)(B), the portion of the put provision of the Letter Agreement relevant to the litigation, is rescripted as Appendix A.

7. In establishing the price, KCSI Senior Vice President–Finance, Donald L. Graf, determined that the purely financial value of the LDX Group shares ranged from $84 to $132 per share. The purchase price represented a 32% strategic value premium over the midpoint of the financial values attributed by Graf. The significance of this evidence as proof of the fair market value of the LDX Group shares at the time Wulfing exercised his put rights under the Letter Agreement is an issue KCSI raises, and the opinion treats.

Williams, entered the negotiations. Barnard and TWC reached tentative agreement on a merger between LDX Group and WilTel, with KCSI owning 35% and TWC 65% of the combined entity. KCSI senior vice president Graf then made a proposal which called for a merger between WilTel and LDX Net, the subsidiary of LDX Group. This proposal called for TWC to retain 81% of the combined entity with KCSI/LDX Group retaining 19% and receiving $95 million in cash. KCSI was to be paid $5 million of the money directly for expenses of the merger and $90 million to pay LDX Group bank debt to secure KCSI's release from its guarantee of 40% of that debt. TWC accepted.

Wulfing, Barnard and other minority shareholders opposed the business combination at the LDX Net level because a merger at the LDX Group level, as promised, would have provided for cash payment to them for their shares in the LDX Group. The proposed agreement to combine LDX Net and WilTel was sent to the directors of LDX Group. It included a stockholders agreement to be entered by Williams, LDX Group, KCSI and NEWCO [later WTG] the new entity into which the business of LDX Net and WilTel was combined that gave Williams a right to purchase the WTG stock owned by LDX Group. Wulfing, Barnard and other minority owners threatened to sue to enjoin the transaction. Concessions were negotiated and agreement was reached among KCSI, LDX Group and the minority stockholders of LDX Group.

The merger between LDX Net and WilTel was finally consummated on July 15, 1987. At this time, LDX Group ceased to be an operating company and became an investment company, because its business was only the ownership of stock.

Shortly after the merger, LDX Group general counsel Shapleigh asked KCSI to purchase his 2,000 LDX Group shares and 8,100 options. KCSI paid Shapleigh $880,-000 for his stock and options. Then, in October of 1987, minority shareholders Barnard, Snider and Hutchins notified KCSI of the exercise of their put rights. Barnard sought to have the price of the stock set by the investment banker appraisal process option in the Letter Agreement. KCSI notified Barnard [and all shareholders] that it would, instead, register his stock as allowed in the put provision and that preparation for registration with the SEC was in process.

In March of 1988, plaintiff Wulfing notified KCSI that he wished to sell all of his shares of LDX common stock in accordance with the provisions of the Letter Agreement. KCSI notified Wulfing that KCSI would exercise its option to register Wulfing's shares of common stock.

In 1988, WTG, the new company, as was its right, made a capital call for $150,000,-000. LDX Group could not meet its portion of the call and LDX Group's ownership of WTG was reduced from 19% to 16.325%. In September of 1988, Williams sought to acquire LDX Group stock through its call option. Negotiations commenced without immediate result. For the year ending December 31, 1988, LDX Group had a net operating loss of $19,500,000. Also, KCSI was owed $64,000,000 in debt, and $4,800,-000 in accumulated preferred stock dividends because KCSI had infused $33,000,-000 in capital in exchange for the preferred stock. In August of 1989, WTG issued a capital call for another $150,000,000. This required LDX Group to borrow $25,000,000 from a bank which KCSI guaranteed.

Then, in November of 1989, the negotiations between Williams and LDX Group resumed and resulted in the agreement whereby LDX Group sold its 16.325% of the WTG stock to Williams for $100,000,-000. The stock sale netted LDX Group only enough money to repay its outside debt and a portion of the debt owed KCSI. LDX Group still owed KCSI some $25,000,-000 in debt and $39,000,000 in preferred stock obligations. No money remained for any of LDX Group common stockholders when the company was liquidated in 1991.

### The Registration of the LDX Group Stock[8]

In response to Barnard's put notice in October 1987, KCSI elected the registration option under paragraph (1)(B) of the Letter Agreement and informed Barnard that KCSI would "initiate the registration process expeditiously." KCSI president Rowland referred the matter to his former partner at the Watson, Ess, Marshall and Enggas law firm and head of its securities practice group, John Marvin, with instructions to prepare the documents necessary to accomplish the registration of the LDX Group shares for public sale as expeditiously as possible. KCSI was an important Watson, Ess client.

Marvin assigned the preparation of the registration statement to a Watson, Ess associate just over two years out of law school. About half of the associate's time with the firm was given to securities practice. The associate had worked on two registrations, but he never before had primary responsibility for a project to register stock for public offering. The associate acknowledged that to "a great extent" he was the one who drafted the registration, coordinated and "put the [project] together." He worked under the guidance and direction of Watson, Ess partners, Marvin and Carpenter.

Carpenter was the manager of the taxes and estates group of the firm, but was not part of the securities group of the firm. Nor, as he acknowledged, was the registration of securities in his "primary area of expertise." To the extent that the associate's assignment involved "issues under the securities laws" Carpenter conceded, he "wasn't really involved in that." He conceded also a lack of expertise to review the judgments made and strategies developed by the associate on securities issues.

John Marvin testified that he exercised "an overall responsibility," and met with the associate "to discuss legal issues as they arose as he handled this project."

Marvin described the registration statement in process as "unique and quite different" from any in his experience because, among the reasons, the shareholders whose shares were being registered were hostile and the registration dealt with a company that was insolvent. The LDX Group registration project was assigned to the associate in October of 1987. Marvin's time sheet for the LDX Group registration account shows his first entry as April 28, 1988 and his last entry as April 30, 1990. There were time charges on a total of twenty-one days. The associate agreed that after the initial meeting with Marvin in October of 1987 there was only limited, "but adequate," discussions with him about the registration process.

The associate determined that the registration should proceed under the Securities Act of 1933. In October of 1987, however, as a result of the merger, LDX Group had become an investment company with its business limited to the ownership of ALC stock and WTG stock. An investment company is a company that is primarily engaged in the business of investing and reinvesting holdings or owning securities of other companies. An investment company is subject to the registration requirements of the Investment Act of 1940 and must register under that Act unless an exemption applies. Prior to the merger, LDX Group was not an investment company because LDX Group owned one hundred percent of LDX Net, an operating company. A company that owns one hundred percent of an operating company is itself an operating company.

Marvin testified that he was aware that in October 1987 LDX Group fell within the provision of the Investment Company Act of 1940, but believed that exemption 3(c)(1) of the 1940 Act was available to LDX Group should it undertake to register under the 1933 Act. He discussed this subject with the associate. To qualify for the 3(c)(1) exemption, the investment company

---

**8.** It was Wulfing's submitted theory of recovery that KCSI did not cause LDX Group to file as expeditiously as possible a registration statement with the SEC so as to permit the public sale of his shares, and that when registration was accomplished, the shares were without value and plaintiff was damaged. It was on this theory of submission that the jury returned a verdict in favor of the plaintiff. In the course of review and opinion the evidence is viewed in the light most favorable to the verdict.

must meet two tests at all times: the company must have less than 100 shareholders and it must not propose to make or make a public offering. The response by President Rowland of KCSI to the October, 1987, notice by Barnard, Snider and Hutchins of the exercise of their put rights, that KCSI elected the registration option "so as to permit the public sale of your shares," constituted a proposal by LDX Group to make a public offering and extinguished LDX Group's 3(c)(1) exemption. By virtue of Rowland's letter, LDX Group became an inadvertent investment company and was required to register under the 1940 Act.

Those were the opinions of John Granda, a partner in the law firm, Stinson, Mag & Fizzell and head of its securities group. Granda was formerly with the SEC and is an expert in corporate and securities law. At the trial, Granda reviewed the relevant documents and explained how to proceed with an expeditious registration of the LDX Group shares. To register shares for public sale, LDX Group which by October 19, 1987, was a closed-end investment company was required to register under both the 1933 Act and the 1940 Act by filing a Form N–2 registration statement. It was his opinion that the registration statement should have taken no more than thirty to sixty days to prepare and would have been filed within ten days to two weeks after the LDX Group audited financial statements became available in April 1988. Diligent attention to the SEC approval process would have accomplished a successful registration by early June 1988. KCSI did not register the shares until more than two years later, on August 31, 1990.

The evidence of what caused the delay was in some dispute. It was forthrightly acknowledged by the associate, however, that after his initial meeting with Marvin, the associate concluded that registration should proceed under the 1933 Act. The associate did not research the 1940 Act because he believed that 3(c)(1) was available to exempt LDX Group from the 1940 Act. He had spent most of October 1987

doing research as to which form to use, and did not even begin to draft the registration statement until January 20, 1988. The associate was unable to give full time to this project from October 1987 through January 1988 because of other assignments. From October 1987 to March 1988, he proceeded on the assumption that 3(c)(1) exempted LDX Group from the 1940 Act.

The associate came to question his reliance on, the section 3(c)(1) exemption in March 1988 when he sent a draft of the registration statement to Price Waterhouse for comments. Price Waterhouse responded that "this thing is an investment company and we don't think you are going to be able to use the 3(c)(1) exemption." That comment prompted the associate to research the 3(c)(1) question for the first time. He could find no "definitive authority" as to the correctness of the Price Waterhouse comment and so, in consultation with other Watson, Ess lawyers, it was decided to seek a "no-action letter" from the SEC.[9] The associate did not send the request to the SEC until May 5, 1988, although it requires only a few days to complete. On August 18, 1988, the SEC denied the KCSI request for confirmation of the 3(c)(1) exemption. Without an exemption, the only option open to KCSI was to register under the 1940 Act. It was the same option that was available in October 1987. The law firm "considered seriously" filing under the 1940 Act in March 1988 after the Price Waterhouse comment, but KCSI wanted to avoid the burdens to LDX Group of revised corporate structure and revised methods of operations among others that registration under that act entailed. The associate's time sheets reflected that from September 1988 through June 1989 the registration effort was abandoned.

KCSI explains that nonaction as authorized by a settlement agreement concluded in October 1988 between KCSI and the LDX Group minority shareholders, including Wulfing. The settlement agreement was occasioned by the exercise by Williams Telecommunications of its stock call rights

---

9. A "no-action letter" is a letter to the SEC that explains a position on a particular issue and asks the SEC to confirm that the position is correct.

to the WTG shares held by LDX Group. It expressed, among other things, a formula for the distribution to the minority shareholders of their portion of the proceeds of the sale. Whatever else its true effect, the settlement agreement expired by its own terms on July 1, 1989.

In July 1989, in anticipation of the sale by KCSI of WTG shares held by LDX Group, the associate researched the availability of a liquidation exemption to the 1940 Act. The WTG shares held by LDX Group represented 90% of its assets, and the sale of those shares would effectively liquidate LDX Group. KCSI sold the WTG shares in November 1989. Thereafter in May 1990, the SEC issued a no-action letter to KCSI for the liquidation exemption under the 1940 Act. Registration of LDX Group shares became effective August 31, 1990, then without essential value and the company in the process of liquidation. Finally, LDX Group was formally liquidated on July 18, 1991.

It was the testimony of plaintiff's expert Granda, as noted, that diligent attention to the SEC approval process would have accomplished an effective registration in early June 1988. It was the testimony of KCSI's securities expert and former SEC lawyer adviser, Grant, that, the condition of LDX Group considered, registration under either act would have taken a great deal of time. He gave the opinion that under the circumstances, KCSI had caused the registration as expeditiously as possible. This was also the testimony of numerous Watson, Ess attorneys and KCSI employees.

### Damages

In 1988, LDX Group's principal assets were its ownership interests in WTG and ALC Corp. It was the opinion of John Korschot, the Managing Director of Corporate Finance for Stern Brothers, a Kansas City investment banker, that the purely financial value of LDX Group stock, without attribution of strategic value, was $130 per share. That valuation was pertinent to the period from January 31 to September 1, 1988. There was evidence, moreover, that the LDX Group stock, because of its interest in WTG, had at that time a strategic value above its purely financial value. That was the reason, Clark McLeod, former president of Telecom USA, gave for his interest in acquiring LDX Group stock. Landon Rowland of KCSI also acknowledged that LDX Group stock had a strategic value, regardless of its purely financial worth.

Wulfing testified that the value of his LDX Group shares was between $195 to $260 per share. Wulfing came to that valuation by a calculation that assigned a $130 financial value to each share and added a 50% to 100% strategic value premium. Wulfing was the chief financial officer of LDX Group from its inception through 1987, and was a director from inception until January 1990. Throughout that time he kept informed of the financial performance of the company. Wulfing also had more than 20 years of experience as an investment banker who performed valuations, pricing calculations and rendered opinions.

Barnard, the president of LDX Group, had extensive experience preparing business plans, financial projections and valuation analyses for LDX Group and other telecommunications businesses. He testified that, as a conservative estimate, LDX Group stock was worth $200 per share in 1988.

KCSI also presented an expert on valuation of the LDX Group shares. Steven Walter, an investment banker, gave his expert opinion, that based upon Korschot's [plaintiff's expert] calculations, but with corrections for an inflated earnings multiple, unreasonably weighted projections and other such factors, Korschot's valuation would be reduced to a negative $27 per share. His own calculations found the LDX Group stock was worth slightly more than zero or slightly less than zero.

In gist, the Wulfing evidence undertook to prove that had KCSI fulfilled its contractual obligation, to register the LDX Group shares as expeditiously as possible, Wulfing would have had an effective registration by mid–1988 and would have sold his

shares to a third party at that time. Wulfing would have received $303,160 for his 2,332 shares at $130 per share and $466,400 at $200 per share. In addition, Wulfing would have immediately exercised his 6,100 options [at the exercise price of $40 per option] and his 1,800 warrants [at the exercise price of $95 per warrant], put those shares to KCSI and sold those shares as well. At a sale price of $200 per share, Wulfing would have made a profit of $976,000 on the 6,100 shares purchased by option and $189,000 on the 1,800 shares purchased by warrant.

The jury returned a verdict for Wulfing for $261,920. The trial court awarded Wulfing prejudgment interest of $74,647.20 and costs of $17,575.35. Judgment was entered for Wulfing for $354,142.55.

### Points on Appeal

The brief for appellant KCSI raises twenty-five numbered points relied on. The brief of respondent Wulfing cites thirteen points that advance arguments not preserved with the trial court, or which relate to testimony not found in the trial transcript, or which are not preserved in KCSI's after trial motion, or which infract rules of appellate procedure, and so do not deserve our review. We address each in turn in the course of decision of the points.

*Point I.*

█ The first contention ascribes error to the trial court in admitting the testimony of Barnard and Wulfing as to the Letter Agreement of June 21, 1985, and the Minority Owners Settlement Agreement of October 21, 1988, as violations of the parol evidence rule "in that their testimony varied and/or contradicted the terms and conditions of the Letter Agreement and Settlement Agreement."

The respondent Wulfing contends that this statement of "point relied on" collapses four disparate contentions of error in the motion for new trial into a single attempted "point relied on," thus violates Rule 84.04(d), and so does not deserve our review. The respondent contends more: that the KCSI brief does not specify, nor otherwise cite to the trial transcript, what

of Barnard's testimony was the source of the trial error that the "point relied on" means to assert. *Thummel v. King*, 570 S.W.2d 679 (Mo. banc 1978), discountenances the practice that groups numerous incidents of error into a single "point relied on" where the incidents of error do not relate to a single issue. *Id.* at 688[14]. It does not serve the purpose to address each detail of criticism and response. It is enough to say that as to "point relied on I", the complaint that the appellant unduly presents as one assignment of error incidents of error that are multifarious, is justified.

█ That the composites of "point relied on I" are all couched in terms of violation of the parol evidence rule does not satisfy the sense of Rule 84.04(d), nor the authority of *Thummel*, that the multiple incidents of error a "point relied on" addresses relate to the same issue. The parol evidence rule as such, unrelated to a specific integrated writing, is merely an expression of abstract principle. It is a rule of substantive contract law, thus its operation in the first instance depends upon the specific contract in issue. *See generally*, S. Gard, MISSOURI EVIDENCE § 17.01 (1985). It depends also upon whether that contract is the basis for the assertion of the right that the parol evidence addresses, and, if so, whether the parol evidence aids to complete the terms, contradicts the terms of a complete contract, or only aids the interpretation of the written terms. *See Kinser v. Elkadi*, 674 S.W.2d 226, 234[9, 10] (Mo. App.1984); *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316, 324[5, 6] (Mo. banc 1979); RESTATEMENT (SECOND) CONTRACTS § 212 comments a, b (1981); CORBIN ON CONTRACTS §§ 573, 579 (1960).

█ The claim that the Wulfing petition asserts, as does the recovery returned by the verdict of the jury, rests directly on the contractual obligation of KCSI under the Letter Agreement of June 1985 to cause LDX Group to file as expeditiously as possible a registration statement with the SEC to permit the sale of the Wulfing shares. As such, the Letter Agreement comes within the scope of the parol evi-

dence rule. *Kinser v. Elkadi*, 674 S.W.2d at 234[9, 10]. The defense of estoppel that KCSI pleaded affirmatively to foreclose the claim of right, and tendered to submit to the jury, rests directly on the Settlement Agreement of October 1988. As such, the Settlement Agreement also comes within the scope of the parol evidence rule. *Id.*

■ The rule operates, however, to exclude parol and other extrinsic evidence that contradicts the terms of a *"complete written instrument"* not otherwise tainted by "fraud, common mistake, accident or erroneous omission." *Craig v. Gardner*, 586 S.W.2d at 324[5, 6] [emphasis added]; *Harris v. Union Elec. Co.*, 622 S.W.2d 239, 246–47[3, 4] (Mo.App.1981). If an agreement is not complete integrated therefore, the parol evidence rule has no application. *Rufkahr Constr. Co. v. Weber*, 658 S.W.2d 489, 497[5, 6] (Mo.App.1983).

The parol evidence rule, therefore, is more authentically called the rule against contradiction of integrated writings. COR-BIN ON CONTRACTS § 572C (Supp.1992). "Point relied on I," however, does not say that the Settlement Agreement somehow completes the Letter Agreement or that the Letter Agreement is essential to the understanding of the Settlement Agreement as an integrated writing. "Point relied on I", rather, posits each, the Letter Agreement and Settlement Agreement, as separate and integrated writings. In that sense, each agreement, although related, is made collateral to the other so that proof that implicates the parol evidence rule as to one writing does not as to the other. *Dutcher v. Harker*, 377 S.W.2d 140, 143[3, 4] (Mo.App.1964). In that sense also the undifferentiated complaint that "point relied on I" presents, that the admission of the testimony of Wulfing and Barnard interpreting the Letter Agreement and Settlement Agreement violated the parol evidence rule, is multifarious and violates Rule 84.04(d).

The breach of *Thummel* is more than technical and review of the point may be denied. But the complaints the point intends are understandable and, notwithstanding the burden imposed by the expla-nation required to give them perspective, the merits of the appeal are best served by our address to these complaints. *Robinett v. Robinett*, 770 S.W.2d 299, 304–05[13] (Mo.App.1989).

The substantive complaints of "point relied on I'' as to the Letter Agreement are: (1) It violated the parol evidence rule to allow Barnard to testify as to the content of a letter of September 1983, written by Landon Rowland for KCSI to Barnard, precursor to a May 1985, letter to LDX shareholders itself superseded by the June 1985 Letter Agreement; (2) it violated the parol evidence rule to allow Wulfing to testify that he subscribed to the Letter Agreement because the KCSI "shall cause LDX to file as expeditiously as possible a registration statement with the Securities Exchange Commission" language of the Letter Agreement was stronger than the language in the May 1985 agreement that KCSI "shall use its best efforts to cause" the registration.

■ The essential argument that percurs the KCSI "point relied on I" is that the "Letter Agreement was the contract upon which Wulfing brought suit," and "[i]t is presumed that a written contract embodies the entire agreement of the parties." Therefore, the testimony of Barnard concerning prior agreements that culminated in the Letter Agreement and the testimony of Wulfing concerning his reasons for entering the agreement undertook to modify and vary the terms of the Letter Agreement in violation of the parol evidence rule.

The argument cites a number of decisions, among them *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d 316. That decision confirms, however, that the parol evidence rule as a principle of substantive law prohibits the contradiction of integrated contracts. *Id.* at 324[5, 6]. If the contract is incomplete, the parol evidence rule does not apply and parol evidence is competent to resolve the meaning. *Rufkahr Constr. Co. v. Weber*, 658 S.W.2d at 497[5, 6]; *Hardesty v. Mr. Cribbin's Old House, Inc.*, 679 S.W.2d 343, 346[1, 2] (Mo.App.1984). "Since the rule prohibits contradiction of *integrated* writings, it only applies to evi-

dence offered after the court has fully heard all the evidence relevant to the issue whether the writing in question is in fact integrated." CORBIN ON CONTRACTS § 572C(E) (Supp.1992).

The antecedent question, therefore, is always whether the writing is the full agreement of the parties. RESTATEMENT (SECOND) CONTRACTS § 209(2) (1981) states:

Whether there is an integrated agreement is to be determined by the court as a question preliminary to determination of a question of interpretation or to application of the parol evidence rule.

If a contract is found not to be integrated, then "collateral facts and circumstances may be introduced to ascertain the subject matter of the contract." *Craig v. Jo B. Gardner, Inc.*, 586 S.W.2d at 324[5, 6].

It is evident from the pointed inquiries to counsel and its ruling to allow the evidence as to prior agreements on the subject between KCSI and Wulfing and other minority stockholders as a course of dealing, that the court determined that the substance of the Letter Agreement beyond the written language itself had yet to be established. That testimony was by Barnard and related contents of a letter from Rowland. It confirmed a mutual decision to amend an agreement in principle according to which the LDX Group was formed. It included an "Agreement to Purchase" LDX Group shares and contained the first put agreement. It also set out the financial objectives of the parties for entering the contract. They included access to capital by public ownership, liquidity and capital appreciation for the owners. The witness understood that the liquidity objective was met by the put provision.

■ The court properly overruled the objection that "[t]he purpose [of the testimony] is to violate the parol evidence rule plain and simple." In strict terms, up to that time in the proceedings the integrated Letter Agreement was not yet established. Thus, there was no certain term to contradict and the parol evidence rule was not operative. Evidence of agreements or negotiations prior to or contemporaneous with the adoption of a writing are admissible to establish that the writing is or is not an integrated agreement and to establish the meaning of the writing, whether or not integrated. RESTATEMENT (SECOND) CONTRACTS § 214(a)(c) (1981); *Hardesty v. Mr. Cribbin's Old House, Inc.*, 679 S.W.2d at 346[1, 2]; *Rufkahr Constr. Co. v. Weber*, 658 S.W.2d at 497[8, 9]. Moreover, the parol evidence rule does not exclude proof that the writing omits a fundamental assumption upon which the agreement is made. CORBIN ON CONTRACTS § 590 (1960). The testimony of Barnard, that the objective of liquidity was met by the put provision in the antecedent agreements and was also an assumption of the subscription of the minority shareholders to the Letter Agreement, was admissible on that basis alone.

■ Wulfing testified that he executed the Letter Agreement because the "shall cause" language in the KCSI registration option was stronger than the "shall use its best efforts to cause" language in the predecessor agreement. This testimony was properly received over the parol evidence rule objection for reasons already given. It was also admissible to establish the meaning of the option term "as expeditiously as possible," as well as to show the actual consideration for the Letter Agreement. *See* S. Gard, MISSOURI EVIDENCE § 17.21 (1985); CORBIN ON CONTRACTS § 586 (1960).

■ The other composite of "point relied on I" asserts that the testimony by Barnard and Wulfing that the Settlement Agreement did not allow KCSI to discontinue its registration effort was improperly admitted over the parol evidence rule objection. There was no such opinion by Wulfing. He was merely asked whether in the process of negotiating the Settlement Agreement if KCSI ever asked him "to agree that they should be free to abandon the registration effort while this settlement agreement was in effect." He answered, "They did not." There was no parol evidence rule objection, nor was there any evident basis for one. It was Barnard who responded that no language in the Settle-

ment Agreement "says that [he] or Mr. Wulfing or any other minority shareholder agrees that KCSI can discontinue their registration efforts while this is in effect." He answered also that KCSI never asked him for such an agreement. The court observed that the "registration efforts" was not mentioned at all in the release language of the Settlement Agreement, and left it for the interpretation of the witnesses. It was admissible for that purpose for reasons already given. "Point relied on I" is denied.

*Point II.*

■ The second point of error contends, in composite, that (1) the evidence that Wulfing's damages included his unexercised options and warrants was beyond the scope of the pleadings and so improperly admitted, (2) the evidence was in any event speculative in that Wulfing never attempted to exercise his options and warrants, nor that he would have, and in that the price at which they could have been sold at some unknown time was unascertainable.

Wulfing's amended petition requests damages only for his 2,332 shares. The exercise of the warrants and options to purchase LDX Group shares were not terms of the Wulfing formal notice to KCSI of the exercise of his put right under the Letter Agreement. Nor were they included in the pleadings as an element of damage from the failure of KCSI to proceed with and accomplish the registration of the LDX Group shares as expeditiously as possible. Nevertheless the court allowed the testimony of Barnard and Wulfing that, had KCSI either purchased the shares or registered them expeditiously, Barnard and Wulfing would have converted the warrants into common stock and exercised the options for common stock and then put those new shares under the Letter Agreement. Moreover, over objection that it was beyond the scope of the pleadings, Wulfing was allowed to testify that had his LDX Group shares been registered expeditiously in 1988, he would have made a profit of $160 per share from the exercise of his 6,100 options and $105 per share from the exercise of his 1,800 warrants.

Wulfing argues that Rule 55.05 requires of the pleader only a short, plain statement of facts showing entitlement to relief and a demand for judgment. He argues also that the issue of damages from the ownership of the options and warrants, although not specifically pleaded, was tried by consent when KCSI failed to object "to this testimony during Wulfing's direct examination." *See* Rule 55.33(b). Direct examination did elicit testimony from Wulfing, and without objection, that he owned 1,800 warrants and 6,100 options and the exercise price of each. This phase of examination, however, elicited response from Wulfing that had the shares been registered expeditiously in 1988, he would have exercised both the warrants and the options "assuming that the sale price was greater than the exercise price." [The objection that the question called for speculation and conjecture had been overruled].

It was not until redirect examination that Wulfing was asked about the profit he would have realized from the exercise of options and warrants had KCSI registered expeditiously in 1988. It was then that Wulfing testified that his damages were $160 per option and $105 per warrant. It was then, also, that counsel for KCSI objected that the testimony as to warrants and options was beyond the scope of the pleadings. The court overruled the objection with the comment: "You've been talking about options and warrants all day."

■ It is evident from the ruling that the testimony was received on the premise that the failure to make a timely objection constituted the implied consent by KCSI to try the issue of damages from the loss of profits from Wulfing's options and warrants. In order for evidence admitted without objection to effect an amendment to pleadings by implied consent under Rule 55.33(b), however, that evidence must bear only on that issue and not be relevant to an issue already in the case. *Smith v. Heisserer,* 609 S.W.2d 485, 486[1–3] (Mo.App. 1980). The testimony by Barnard as to his ownership of warrants and options, of course, does not bear on Wulfing's claim

for damages, and so could not have served to amend the pleadings by implied consent. Moreover, the earlier testimony by Wulfing of his ownership of options and warrants, which included the response that were he able to sell his 2,332 shares under the registration option he would have exercised both the warrants and the options "assuming that the sale price was greater than the exercise price," bears not only on damages from the unexercised warrants and options but also on the value of the shares of stock an issue already in the case. It is circumstantial proof that Wulfing never considered the stock to have a worth of more than $40, the option price.

In this case, KCSI objected at the first assertion by Wulfing that he claimed damages for his options and warrants. "When evidence is relevant to an issue already in the case and there is no indication that the party who introduced it was seeking to raise a new issue, pleadings are not amended by implication or consent under Rule 55.33(b)." *Shaw v. Burlington N., Inc.*, 617 S.W.2d 455, 457[3, 4] (Mo.App.1981).

 This trial lapse notwithstanding, KCSI does not allege any prejudice from either that or other error "point relied on II" encompasses. A claim of error in the admission of evidence will not be sustained without a showing of prejudice from the error. *Bayer v. American Mut. Casualty Co.*, 359 S.W.2d 748, 754–55[11] (Mo.1962). The point is overruled.

*Point III.*

 KCSI cites no authority in support of point III, and review is denied. An appellant has the obligation to cite authority where, as here, the point "is one for which precedent is appropriate and available." *Thummel v. King*, 570 S.W.2d at 687[13]; Rule 84.04(d).

*Point IV.*

The next point contends:
The trial court erred in allowing the introduction of evidence regarding transactions of LDX Group stock because the transactions were not relevant in that they were not comparable in time or cir-

cumstances to Wulfing's request that KCSI purchase or register his stock.

The exposition of the point explains that the evidence erroneously allowed was testimony by Wulfing, Bruening, Barnard and Shapleigh as well as certain exhibits relating to three transactions in LDX Group stock. They were the Shapleigh, Florida/Williams Group and Barnard transactions. In January 1986 the Florida/Williams Group exercised their put right under the Letter Agreement and KCSI purchased their LDX Group stock for $145 per share. KCSI purchased the shares to rid themselves of the vexation of the Florida/Williams Group's interest and to retain 80% ownership of LDX Group for tax purposes.

In October 1987 KCSI purchased the LDX Group stock and options owned by John Shapleigh, KCSI general counsel, for $880,000. Shapleigh was obliged to divest his shares in order to accept a high level governmental position in telecommunications. There was evidence that Shapleigh received a premium for his shares so that the LDX Group could remain on good terms with Shapleigh in the new position. Shapleigh testified that despite the recited allocation of the $880,000 to several considerations, the transaction was in truth the purchase of the LDX stock alone.

KCSI's discussion of the point insinuates yet another instance of a noncomparable sale of LDX Group shares, the purchase of Barnard's shares in 1985 by KCSI for $100 per share. KCSI purchased the shares to achieve 80% ownership of LDX Group.

 It is the contention of this point on appeal that these transactions in LDX stock were not bargained for at arm's length and so were not probative as sales comparable to the worth of Wulfing's stock in 1988. KCSI, however, did not object to testimony of Shapleigh or Barnard on the ground that the sale by each was not comparable. Nor did KCSI object to the testimony of Richard Bruening, KCSI general counsel, regarding the Florida/Williams Group transaction. Therefore, the objection to the testimony of Shapleigh, Barnard

and Bruening was not preserved for review. *State ex rel. State Highway Comm'n v. Northeast Bldg. Co.*, 421 S.W.2d 297, 301[4,5] (Mo.1967). KCSI did object to the testimony of Wulfing as to the amount paid for the Florida/Williams Group stock. However, that evidence was cumulative to that already received without objection from Bruening, and KCSI does not show how it was prejudiced by the non-exclusion of evidence already legitimately before the jury. *Danneman v. Pickett*, 819 S.W.2d 770, 773[6,7] (Mo.App.1991). Point IV is denied.

*Point V.*

■ KCSI contends that it was error for the trial court to allow Wulfing to testify that he had retained two securities law experts, attorneys Schowalter and Short, who had agreed to testify on his behalf, but who did not testify at the trial. KCSI objected that the testimony was hearsay. However, on the motion for new trial, KCSI objected that the evidence was "improper and irrelevant and served only to confuse the jury and prejudice the defendant."

In a case tried to a jury, a party may not argue on appeal an assertion of error not properly presented to the trial court in a motion for new trial. Rule 84.13(a). Nor can any deficiency in the motion be meliorated by the brief. *Bowman v. Burlington N., Inc.*, 645 S.W.2d 9, 11[2] (Mo.App. 1982). Point V is denied.

*Point VI.*

■ This point argues that it was error for the trial court to admit the testimony of expert John Korschot, called by Wulfing to value his stock, because his opinion "was based on evidence not reasonably relied upon by experts in the field of valuing stock and not otherwise reasonably reliable."

Korschot was the managing director for Stern Brothers, a Kansas City investment banker, and its managing director of corporate finance. In that capacity he was responsible for the corporate finance activity of the office, especially the valuation of securities and financial advisories relating to mergers and acquisitions. Wulfing submitted information for his review and analysis for an opinion as to the fair market value of LDX Group stock. Korschot expressed his opinion in a written report that included a letter and a financial analysis section which set out the basis for his opinion.

The data for his analysis and opinion related to the background, operations, financial performance and prospects of the LDX Group. The sources were the officers and directors of the company [Wulfing and Barnard], the management of WTG, audited and unaudited financial statements of LDX Group, WTG and ALC, previous appraisals of LDX Group stock, and trades in LDX Group stock as documented. The financial projections of WTG were reviewed in terms of its 1988 Annual Plan and the WTG Business Plan and Financial Model [both already in evidence as exhibits], as well as other WTG financial information. These projections, the witness testified, are a standard part of the analysis used to form opinions as to the fair market value of stock, and are reasonably relied upon by experts in the field for that purpose. His sources for opinion included also LDX Group's accountants and bankers, also reasonably relied upon by experts in the field. The witness identified the persons with whom he spoke and testified that he addressed to them specific matters concerning their knowledge of and relationships with LDX Group or WTG, and that their responses indicated a reliable level of personal knowledge.

He then testified to the methodologies used to arrive at his opinion of the fair market value of Wulfing's stock. The basic sources for that analysis were the financial projections in the WTG Business Plan and Financial Model, prepared by the joint team of WilTel and LDX Group at the time of the merger in October 1987. Using these financial projections, Korschot applied the dividend discount, discounted cash flow, and adjusted balance sheet methods to come to the opinion that the fair market value of the minority shares in LDX Group was $130 per share as of May 1, 1988.

The claim of error is that this testimony was "without proper foundation in that Korschot's opinion was based on evidence not reasonably relied upon by experts in the field of valuing stock and not otherwise reasonably reliable."

The provisions of § 490.065, RSMo (Cum. Supp.1991), governed the admissibility of the testimony of witness Korschot at the trial. That statute is patterned after Rules 702, 705 of the Federal Rules of Evidence, but with distinctive differences. They both provide [§ 490.065.3, in terms, and Federal Rule of Evidence 703, in substance] [10] that:

[t]he facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

KCSI argues that "[a] fact-supported foundation of reliability is required to meet this standard," and that Korschot's testimony failed to meet that precondition. And, indeed, § 490.065.4 provides

If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.[11]

The complaint is simply that the preliminary disclosure by Korschot at the trial of the facts and data underlying his opinion of value included telephone interviews and other forms of inadmissible hearsay. It is information supplied by sources not available for cross-examination, KCSI argues, and hence for whose reliability the expert was "unable to vouch." KCSI concluded that since the hearsay was such as "could not be removed or segregated from his opinion testimony," there was no reasonable foundation for the opinion of value and Korschot's testimony should have been excluded in whole.

Prior to the enactment of § 490.065.3, our practice permitted an expert to testify to an opinion only if the opinion was based on facts established at the trial. *Fahy v. Dresser Indus., Inc.*, 740 S.W.2d 635, 638[2, 3] (Mo. banc 1987); *Stallings v. Washington Univ.*, 794 S.W.2d 264, 270 (Mo.App.1990). The expert could not testify to an opinion that rested in part on hearsay unless the hearsay facts were submitted to the expert for opinion by means of a hypothetical question that included the relevant matter in evidence. *Kennett v. Akers*, 564 S.W.2d 41, 50[16–18] (Mo. banc 1978). Our law had already validated even before the enactment of § 490.065, nevertheless, the practice of experts that bases an opinion on data and reports derived from persons outside of court and other than by their own perceptions. *See Stallings v. Washington Univ.*, 794 S.W.2d at 271; Hopkins, *Expert Testimony: New Rules, New Questions*, 46 J.Mo.Bar, April–May 1990, at 175, 180. That rule of decision comports with the sense of Rule 703 of the Federal Rules of Evidence.

Section 490.065(3), as does Federal Rule 703, permits expert opinion on "before the

**10.** Fed.R.Evid. 703 provides, in terms,

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, *the facts or data need not be admissible in evidence.* [emphasis added.] (The underscored clause has no counterpart in § 490.065).

**11.** The Federal Rules of Evidence, on the other hand, do not require the predicate of a foundation for the opinion or inference of the expert. Rule 705 provides expressly that

[t]he expert may testify in terms of opinion or inference and give reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination.

*See* Advisory Committee's Note to Federal Rule 705; 1 McCORMICK ON EVIDENCE § 14 (4th ed. 1992); Hopkins, *Expert Testimony: New Rules, New Questions*, 46 J. of Mo. Bar, April–May 1990 at 175.

hearing" out of court facts, if the facts are of "a type reasonably relied upon by experts in the field" and the proponent of the evidence satisfies the trial judge that the hearsay facts are otherwise reliable. The design of subsection 3 of § 490.065 and that of Federal Rule 703 are congruent: "... to bring the judicial practice into line with the practice of the experts themselves when not in court." Advisory Committee's Note to Federal Rule 703; *Stallings v. Washington Univ.*, 794 S.W.2d at 271. This practice, as a juridical principle, is justified by the premise that a witness with specialized knowledge is as competent to evaluate the reliability of the statements presented by other investigators or technicians "as a judge and jury are to pass upon the credibility of an ordinary witness on the stand." 1 McCORMICK ON EVIDENCE § 15 (4th ed. 1992).

■ Thus, where expert opinion rests in part on factual information not in evidence, the standard objection such as that there is no opportunity to test the credibility of its sources at the trial or to cross-examine the witness as to the extrajudicial facts no longer avails, either as to the reasonableness of the foundation for the opinion or to the opinion itself. §§ 490.065(.3)–(.4). The questions are, rather, whether the hearsay as tested by professional acceptance standards in the field is reasonably reliable, and whether it is otherwise reasonably reliable as a matter of general evidentiary principle.

The first, § 490.065.3, takes the facts and data relied on by experts in the field for an opinion, if reasonable, as sufficient basis of worthiness for reliance, and so excuses them from compliance with the rules of evidence. The second, § 490.065.4, engages the independent responsibility of the trial judge to decide if the foundational facts meet the minimum standards of reliability as a condition of the admissibility of the opinion. *See* 1 McCORMICK ON EVIDENCE § 14, 66 n. 10 (4th ed 1992).

■ As a rule, questions as to the *sources* and bases of the expert's opinion affect the weight, rather than the admissibility, of the opinion, and are properly left to the jury. *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422[2] (5th Cir.1987). In cases where the source upon which the expert relies for opinion is so slight as to be fundamentally unsupported, the jury may not receive the opinion. *State ex rel. Missouri Highway & Transp. Comm'n v. Sturmfels Farm Ltd. Partnership*, 795 S.W.2d 581, 590[28] (Mo.App.1990). Such testimony lacks even that modicum of weight as would assist the jury "to understand the evidence or to determine a fact in issue." § 490.065.1.

The "impermissible hearsay" that KCSI complains of are sources of information normally and reasonably relied on by investment bankers and other kindred experts to derive an opinion as to the fair market value of corporate stock. It is an opinion of value, moreover, otherwise supported by a mass of facts and data before the trial judge properly and without objection.

■ The complaint that Korschot was asked to assess the "credit worthiness" of witnesses Wulfing, Barnard and Dandelles is an impropriety of language insinuated into the record by KCSI, and not the plaintiff. The question was merely whether, "By those gentlemen's responses or statements, did they indicate to you a level of personal knowledge as to those matters which, based on your experience, you found to be trustworthy and reliable?" To which Korschot answered, "Yes." It was an assessment by the expert of the reliability of a source of data for opinion, and not of its "credit worthiness." The trial judge is expected to defer to the expert's assessment of what data is reasonably reliable. *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1432 (5th Cir.1989). The point is denied.

*Point VII.*

■ KCSI next contends that the trial court erred in the exclusion of its exhibit 753, a letter of August 2, 1988, from Harry Hirsch to Landon Rowland, which included a revised financial forecast in WTG's long-range plan. Harry Hirsch was the WTG senior vice president of finance and admin-

istration. Landon Rowland was a member of the WTG board of directors. KCSI explains that the letter was admissible because it was written in the ordinary course of WTG business, and was sent to and kept by Rowland [as a WTG director] in the ordinary course of WTG business, and so qualified as a business record under § 490.-680. The financial projections of WTG had been revised to lesser profitability, and the tendered exhibit informed Rowland of the new estimates. The exhibit was meant to prove that the data relied on by Wulfing's expert, Korschot, for valuation of the LDX Group stock was inflated, inaccurate and unreliable.

To qualify as a business record under § 490.680 a "custodian or other qualified witness" must testify to (1) the identity of the record, (2) the mode of its preparation, (3) that it was made in the regular course of business, (4) at or near the time of the act, condition or event. *State v. Luleff,* 781 S.W.2d 199, 201[2] (Mo.App.1989). The exhibit may be understood to have been issued by WTG to a WTG director so as to constitute Rowland an "other qualified witness" under the statute. *See Angotti v. Celotex Corp.,* 812 S.W.2d 742, 752[18] (Mo.App.1991). The record shows nevertheless that KCSI failed to establish the foundation necessary to qualify the exhibit as competent evidence under the statute. There is no testimony by Rowland that the letter was sent by Hirsch to Rowland in the regular course of his duties as an officer of WTG. Nor did Rowland testify as to the mode of the preparation of the exhibit or that it was prepared in the ordinary course of WTG's business. The rejection of the tendered exhibit was proper. *Danna v. Casserly,* 763 S.W.2d 338, 343 (Mo.App. 1988). The point is denied.

*Points VIII, IX.*

KCSI cites no authority in support of Points VIII and IX. The points are deemed abandoned, and review is denied. Rule 84.-04(d); *Thummel v. King,* 570 S.W.2d at 687[13].

*Point X.*

The next point contends that it was error, for three reasons, to admit the opinion testimony of John Granda, a securities law specialist, to the effect that in order to comply with its obligation under the Letter Agreement, KCSI should have caused LDX Group to be registered as an investment company. First, the put agreement in express terms required KCSI to register for sale Wulfing's stock, and not to register LDX Group as an investment company under the Act of 1940. Second, Granda's theory of registration was impossible because under that act a registered investment company may make no public offering of its securities unless it has a net worth of at least $100,000 and, at the time, LDX Group had a negative net worth of more than $10,000,000. Third, Granda's expert testimony and opinion was as to a matter of law and so invaded the province of the trial court.

The arguments, first and second, are raised for the first time on appeal. They were not presented in the motion for new trial, were not preserved, and will not be considered. Rule 78.07. The third argument posits that Granda's testimony concerning the registration process was so replete with the legal opinions, such as: what exemptions the SEC staff would have permitted, the interpretation and application of statutes and regulations, predictions of the determinations of administrative agencies and courts and other matters of law reserved for the trial judge, as to have invaded that judicial prerogative.

It is the rule that the opinion of an expert on issues of law is not admissible. *Young v. Wheelock,* 333 Mo. 992, 64 S.W.2d 950, 957[24, 25] (1933). That is because the special legal knowledge of the judge makes such testimony of the witness superfluous. WIGMORE ON EVIDENCE § 1952, (Chadbourn rev. 1978). It also encroaches upon the duty of the court to instruct on the law. *United States v. Bilzerian,* 926 F.2d 1285, 1294[5] (2d Cir. 1991). A witness qualified as an expert in securities regulation, nevertheless, is competent to explain to the jury "the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration statement through the SEC ...

Testimony concern[ing] the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry." *Marx & Co. v. Diners' Club, Inc.*, 550 F.2d 505, 508[1–3] (2d Cir.1977).

The testimony given by Granda conforms to the scope allowed an expert in securities law and regulation. KCSI fails to cite to a particular incursion by the witness into opinions of law.[12] The point is denied.

*Point XI.*

The issue of damages was submitted by Instruction No. 7 in the form of MAI 4.01:

If you find in favor of plaintiff, then you must award plaintiff such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained as a direct result of defendant's failure to cause LDX Group, Inc. to file a registration statement with the Securities Exchange Commission as expeditiously as possible so as to permit public sale of plaintiff's shares of LDX Group, Inc.

KCSI acknowledges that MAI 4.01 is the proper submission in breach of contract cases. *See Boten v. Brecklein*, 452 S.W.2d 86, 93[11–13] (Mo.1970). KCSI cites *Leh v. Dyer*, 643 S.W.2d 65, 67[1, 2] (Mo.App. 1982), for the holding that where the breach of a special type of contract is involved, a not-in-MAI instruction that specifies the items of damage to which the plaintiff is entitled is preferred to MAI 4.01. On that premise, KCSI argues that the trial court erred in the submission of Instruction No. 7 [MAI 4.01] and in the refusal of Instruction No. Z [MAI 4.02 modified]:

If you find in favor of plaintiff, then you must award plaintiff such sum as you

may find from the evidence to be the difference between the fair market value of the stock on August 31, 1990, and the fair market value in May, 1988.

KCSI argues that since in a breach of contract action the law will not place the plaintiff in a better position than had the contract been completed on both sides, Wulfing was entitled to damages only for the difference between the fair market value of the LDX shares in June 1988, the date by which the shares should reasonably have been registered [according to plaintiff's expert, Granda], and August 31, 1990, the date that the registration was effected. Moreover, "the MAI [4.01] general measure of damages instruction submitted by the court failed to limit damages to those based on plaintiff's stock and thus allowed the jury to award damages for the unexercised warrants and options, which were beyond the scope of the pleadings."

■ MAI 4.01 is the proper submission in a case of breach of contract. There is no idiosyncracy of theory or evidence that transmutes Wulfing's claim from an ordinary breach of contract, to a breach of a special type of contract with special damages, and so subject to an instruction that restricts the recovery to the special proof. *Leh* was an oral contract for the support of another for life. *Id.* at 66. *Leh* explains that MAI 4.01, although not inappropriate to submit damages under such a theory of recovery, nevertheless, the preferred practice is to use a not-in-MAI instruction with a specific measure of damages suitable to the theory of the breach of the special contract. *Id.* at 67. *Leh* does not govern the Wulfing theory or submission.

■ Moreover, tendered Instruction Z was not supported by the evidence. It assumes as fact that the breach occurred in May 1988 despite evidence that would support a finding that the breach occurred

---

12. The only allusion to the transcript in appellant's brief on this composite Point X is the directive: "*See generally* Tr. 1485–1571, 1665–1681." The first span, 86 pages, encompasses witness Granda's direct testimony in its entirety. The second span, 16 pages, encompasses Granda's redirect examination. There is no record

of objection in the second spate of testimony on the ground that the answer of the witness was an opinion of law. We were not obliged to delve the undifferentiated first spate of testimony to confirm the contention of error, and did not.

before, during or after May 1988. There was competent evidence of value of Wulfing's shares throughout that year, both as to fair market value and strategic value. An instruction that assumes a fact in issue is not proper. *Beck v. Edison Bros. Stores, Inc.*, 657 S.W.2d 326, 329[5] (Mo. App.1983). It is not error for the trial court to refuse an instruction not correct in every essential respect. *Daniels v. Smith*, 471 S.W.2d 508, 513[7–10] (Mo.App.1971).

■ KCSI insists nevertheless that Instruction No. 7, conformed to the general measure of damages terminology of MAI 4.01, did not limit damages to those based on Wulfing's stock and thus allowed the jury to award damages for the warrants and options, damages beyond the scope of the pleadings. Instruction No. 7, in express terms, returns damages for failure of KCSI to cause the registration with the SEC as expeditiously as possible of "plaintiff's *shares* of LDX Group, Inc." [emphasis added.] In closing to the jury, however, counsel for Wulfing argued for damages not only for the stock at "$200 a share," but also for the 6,100 options and 1,800 warrants. The objection of defendant KCSI that the issue of damages for the options and warrants was "way beyond the scope of the pleadings in this case" was overruled by the court with the comment, "I think he's following the evidence." And, indeed, the evidence of the value of the options and warrants was in the case over the objection that the issue of such damages was not pleaded. As the opinion notes [at *Point II*], the reception of the evidence of the value of the options and warrants was mistaken and erroneous. We rejected that claim of error nevertheless because a claim of error in the admission of evidence will not be sustained without a showing of prejudice from the error. *Bayer v. American Mut. Casualty Co.*, 359 S.W.2d at 754[11].

■ The error of which KCSI now complains is not in the admission of evidence but in the instruction on the case. The untoward consequence, or "prejudice," that KCSI argues is that the jury was thereby allowed to "arbitrarily award plaintiff an amount of damages instead of placing plaintiff in the position he would have occupied had the contract been performed." However, Instruction No. 7 conforms to MAI 4.01 as the instruction applicable in the case. It does not deviate from the form of the model, and so error is not presumed. *Biever v. Williams*, 755 S.W.2d 291, 295 (Mo.App.1988); Rule 70.02(b), (c). Moreover, Instruction No. 7 in terms authorizes damages only for Wulfing's shares. Instruction Z was properly refused as was Instruction Z[1], its "fair market value" definition concomitant.

The claim of error, therefore, reduces to the complaint that plaintiff was allowed to argue damages not properly in evidence, but already before the jury over objection, and to the prejudice of the defendant. It is a prejudice from trial error, moreover, made palpable by the argument of counsel to the jury and the jury response by verdict.

■ The appellate court may not reverse a judgment unless the error materially affects the merits of the action. Rule 84.13(b); *Neavill v. Klemp*, 427 S.W.2d 446, 448[8–10] (Mo.1968). In that assessment, we view the whole of the record the full range of the evidence and instructions for that determination. *Johnston v. Allis–Chalmers Corp.*, 736 S.W.2d 544, 547[2] (Mo.App.1987). The merits of the action were whether KCSI breached the put agreement option to register with the SEC as expeditiously as possible, so as to permit public sale of Wulfing's LDX Group *shares* and, if so, the damages occasioned to Wulfing from that breach. The evidence of the value of the options and warrants for LDX Group shares held by Wulfing as proof of damages from the failure of expeditious registration, and the argument to the jury to include that loss of profit in the general verdict for damages, insinuated a distortion in the measurement of the true damages under the lawful evidence. It also insinuates an indeterminacy in the general verdict for damages returned by the jury that a court of review cannot resolve without speculation and subjective judgment.

Wulfing argues that the range of his evidence of the value of the shares alone was such as would justify the inference that the jury allocated the damage award only to the shares, and not to the options and warrants. He points to the evidence of expert Korschot that during the relevant period of 1988, the purely financial value of LDX Group stock was $130 per share exclusive of its strategic value. He also points to his own estimate that the value of the LDX Group stock was between $195 to $260 per share. He argues that since the Korschot valuation supports a verdict of $303,160 for the original shares alone, and the Wulfing valuation supports a verdict of $454,740 to $606,320, the $261,920 damages actually returned by the jury "may very well have [been] awarded ... for Wulfing's original 2,332 shares alone, and the verdict is fully supportable on that basis."

Our review, as well as our determination of whether the error brought prejudice, and the prejudice affected the merits of the action, however, may not rest on intuition but on the full record. *Johnston v. Allis–Chalmers Corp.*, 736 S.W.2d at 547[2]. The conclusion that "the verdict is fully supportable" on the basis of the Korschot and Wulfing valuations neglects the KCSI evidence by expert Walters that the value of LDX Group shares in May 1988 was "a little below, a little above zero." It also neglects the testimony of LDX Group and KCSI board member Hawkinson that at the time of registration the value of the LDX Group shares was only nominal, and the opinion of Rowland that the shares had no purely financial value after late 1986.

Moreover, there was a range to the evidence as to both the value of the shares and the date by when a registration as "expeditiously as possible" could have been reasonably accomplished in the circumstances that confounds any definite *post hoc* surmise of how much of the award the jury allocated as damages to the shares. The closing argument under Instruction

No. 7 was prejudicial and materially affected the merits of the action. A new trial will be ordered on the issue of damages. *Fowler v. Park Corp.*, 673 S.W.2d 749, 756[13] (Mo. banc 1984).

*Point XII.*

KCSI contends next that the refusal to give Instruction No. Z[3] was error. The premise of the argument is that *as expeditiously as possible* as used in verdict director Instruction No. 5[13] was a legal term and so was not properly submitted to the jury without instruction as to its definition. Instruction No. Z[3] tenders the definition:

> The phrase "as expeditiously as possible" as used in these instructions means a reasonable time to complete what defendant agreed to do in good faith.

KCSI supports the argument that the "as expeditiously as possible" is a phrase with legal content by reference to *Baltimore v. Landay*, 258 Md. 568, 267 A.2d 156 (1970), and *Carl Weissmann & Sons, Inc. v. Pepper*, 480 F.Supp. 1364 (D.Mont.1979). These courts, the argument explains, have interpreted *as expeditiously as possible* to mean that the activity should be completed in a reasonable amount of time. It is not at all evident that the term *as expeditiously as possible* as used in *Baltimore* is anything more than the court's interpolated summary of contract terms rather than an actual term of contract. In any event, the rambling rationale does not treat the phrase, as a legal term nor does the holding render its definition.

In *Carl Weissmann & Sons, Inc.*, the phrase was an actual contract term and the court gave it effect according to the purpose of the contract, not as a matter of legal definition, but as a matter of the circumstances that attended the accomplishment of the contract purpose. In effect, the term *as expeditiously as possible* was given its evident meaning, *as expedi-*

---

**13.** Your verdict must be for plaintiff if you believe:

First, defendant did not cause LDX Group, Inc. to file as expeditiously as possible a registration statement with the Securities Exchange Commission so as to permit public sale of plaintiff's LDX Group, Inc. shares, and

Second, because of such failure, defendant's contract obligations were not performed, and

Third, plaintiff was thereby damaged.

*tiously as possible under the circumstances.*

■ The mischief of tendered Instruction Z[3] is that it serves no purpose. The end term, *in good faith*, not only adds nothing, but confuses the issue of breach before the jury. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981). That duty prevents one party to the contract from exercising a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract. *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473[9, 10] (Mo. App.1986). The verdict director Instruction No. 5 submits a simple breach of contract theory. It does not submit the theory that it was the breach of duty of good faith that denied Wulfing the expected benefit of the put agreement.[14]

The proffered instruction was properly rejected for the more fundamental reason that the term *as expeditiously as possible* is one of common usage and generally understood. It requires no definition. *Transportation Equip. Rentals, Inc. v. Strandberg*, 392 S.W.2d 319, 324 (Mo.1965). It was evident to attorney John Marvin to whom KCSI president Rowland confided the stock registration what the term *as expeditiously as possible* meant in the put provision: "None other than what the words themselves say." And, in further answer to the question: "Just whatever they mean in standard understanding of the English language?" his response was: "I think so." The words themselves meant to attorney Groeneweg, the Watson, Ess associate assigned with the primary responsibility for the registration of LDX Group: "We were making a filing as expeditiously as possible or as quickly as we reasonably could under the circumstances." The circumstances for a registration filing

as expeditiously as possible, in turn, were shown to the jury by expert Granda who explained the SEC process and the schedule for its accomplishment.

The tendered instruction was properly rejected.

*Point XIII.*

■ The next point complains that it was error for the trial court to refuse the estoppel affirmative defense tendered in Instruction No. Y:

> Your verdict must be for the defendant if you believe:
>
> First, plaintiff agreed that beginning in October 1988 that KCSI could suspend its efforts to register the stock, and
>
> Second, KCSI reasonably relied upon such agreement in suspending its efforts to register the stock.

It is argued that Wulfing induced KCSI to cease work on the registration when he signed the minority Settlement Agreement. A provision of the agreement releases and discharges LDX and KCSI from demands, damages, causes of action, etc., related to or arising out of any matter involving valuation of LDX stock, etc., or "any matter involving any Minority Owner as a minority shareholder of LDX". KCSI's argument rests on the premise that "Wulfing's right to put his stock clearly arises from his status as minority stockholder," so, presumably, his accession to the Settlement Agreement released KCSI from any obligation under the put provision of the Letter Agreement. There is no mention or provision in the Settlement Agreement, however, that even implies agreement by Wulfing for KCSI to cease the registration effort.

KCSI insists nevertheless that since Barnard was given Wulfing's power of attorney to enter into the Settlement Agreement, when Barnard told LDX Group president Dehner and KCSI assistant controller

---

14. The *good faith* end term of the tendered instruction is all the more disingenuous because it was expressly used to qualify the conduct of the parties and the investment banker appraisers in the event KCSI elected the purchase option in response to a minority shareholder's put. It is conspicuously absent as a term that qualifies the "as expeditiously as possible" registration option.

Monello that KCSI could stop its registration effort, Barnard spoke also for Wulfing. There is no evidence that Wulfing authorized Barnard to relinquish or act on his registration right under the put provision with KCSI.

The affirmative defense of estoppel was not proven. Instruction No. Y was properly refused.

*Point XIV.*

■ This point asserts that the trial court erred in allowing Wulfing to testify to the value of 16% of WTG stock because he was not competent to express an opinion since he was not a valuation expert nor did he own any WTG stock.

KCSI neither alleges nor shows prejudice from the admission of that evidence. The point is denied. *Danneman v. Pickett,* 819 S.W.2d 770 at 773.

*Point XV.*

■ KCSI complains that it was error to permit Barnard to testify as to comments of William Deramus that he wanted to sell LDX to acquire the Southern Pacific Railroad. It was also error, the complaint continues, to allow Barnard to testify that Deramus said KCSI would take care of the LDX minority shareholders after the LDX business combination with WilTel. As to the latter contention, the testimony came in without objection and the issue has not been preserved. As to both contentions, the comments were competent evidence as admissions made by the chairman of KCSI and attributable to the corporation. *Cline v. Carthage Crushed Limestone Co.,* 504 S.W.2d 102, 114–15[12–15] (Mo.1973). The point is denied.

*Point XVI & XVII.*

The exposition of the points are without citation of authority and will not be reviewed. *Thummel v. King,* 570 S.W.2d at 687[13]; Rule 84.04(d).

*Point XVIII.*

■ This point complains that it was error for the court to refuse KCSI's exhibit 807 as hearsay. The exhibit was an April 12, 1988, memo written by the Watson, Ess associate regarding his contact with the SEC. It was a contemporaneous record of that event. It also noted a conference that the associate had with Watson, Ess partner Carpenter concerning the contact with the SEC. The basis given at the trial by KCSI for the admission of the exhibit was, "this is his way of confirming what [sic] he talked to them." The brief elaborates, "[t]he memo was offered to show that such contact was made and that the associate continued in his effort to obtain a no-action letter because, in his contact with the SEC, he was not discouraged from filing the no-action letter." The exclusion was error, the contention continues, because the memo was not offered to prove the truth of the statements recorded, but to demonstrate the associate's "existing state of mind and the basis of his subsequent actions." Therefore, the memo was not incompetent hearsay. The argument concludes that KCSI was prejudiced because it was erroneously prevented from demonstrating its diligent registration efforts in compliance with the Letter Agreement.

It is to be noted that the court allowed the associate to refresh his memory from the exhibit, although there was no foundation offered that he lacked present memory of the event. And, in fact, the associate testified that he contacted the SEC on April 12, 1988, and as a result of the contact they proceeded with the no-action letter under 3(c)(1) rather than 6(c) because it would take less time for a response and there was a reasonable basis for doing so. Thus the registration efforts of the associate [and KCSI] were demonstrated and before the jury, notwithstanding that confirmation by the writing was not allowed. There could be no prejudice by the exclusion of evidence only cumulative to proof already before the jury. *Schroeder v. Prince Charles, Inc.,* 427 S.W.2d 414, 420[9, 10] (Mo.1968).

■ It is to be noted that under our rules of evidence, a witness may use a writing to refresh memory where the witness lacks present memory of the event and needs the aid of the writing for recall. *Stivers Lincoln–Mercury, Inc. v. Abbott,* 796 S.W.2d 923, 925[3] (Mo.App.1990); *Cf.*

Rule 803(5), Federal Rules of Evidence; 2 McCORMICK ON EVIDENCE § 279 *et seq.* (4th ed. 1992). Neither of these premises was shown. Thus, KCSI received a boon of evidence that does not admit of complaint.

*Point XIX.*

KCSI argues next that the trial court erred in the admission of exhibits 180 and 181 in that they were irrelevant and immaterial to the issue of fair market value of Wulfing's LDX Group stock. KCSI claims prejudice in that the exhibits purport to attribute a range of value to LDX Group shares which is unsupported by the evidence.

Exhibit 180 was prepared by the assistant controller for KCSI and depicted net cash payment to minority stockholders at various buy-out prices. It was, in effect, a series of theoretical mathematical computations. The exhibit was received to counteract the KCSI contention that it did not agree to buy out the minority shareholders following the WilTel/LDX Net merger.

KCSI complains that there was no showing that the circumstances surrounding LDX in June 1987, when the exhibit was composed, were comparable to those in 1988. At the trial, however, KCSI requested and received a limiting instruction, which the court granted. The jury was instructed that the exhibit was "strictly a mathematical computation as to the cost to buy ... a certain number of shares of LDX stock. It is not meant to indicate value nor offer to purchase." A party may not assert as error that the trial court failed to do more than was requested. *Higgins v. Terminal R.R. Ass'n,* 362 Mo. 264, 241 S.W.2d 380, 386[13–15] (Mo.1951).

Exhibit 181, also prepared by the KCSI assistant controller, was the detail of KCSI's per share calculation of LDX stock based on assumed values for the LDX stake in WTG. The exhibit was received to show that KCSI used the same method of calculating the LDX Group shares as did Wulfing's expert, albeit on a different assumed value for the LDX Group stake in WTG. KCSI objects here that exhibit 181

was irrelevant and immaterial to the fair market value of Wulfing's LDX Group stock. There was no such objection at the trial. The contention of error is not preserved for our review. *Missouri Pub. Serv. Co. v. Juergens,* 760 S.W.2d 105, 106 (Mo. banc 1988).

*Point XX.*

There is no citation of authority in support of the contention and it is denied as abandoned. Rule 84.04(d).

*Point XXI.*

KCSI next contends that the court erred in the admission of the deposition of Bruening, KCSI general counsel, concerning the registration process, in that he was not involved in that process so that his testimony on the subject was speculation and without probative value. The testimony excerpt was received at the trial as admissions against interest. It was not objected to on that basis, but, at various stages of the testimony, as hearsay, double hearsay, speculation, conjecture, that there was a lack of foundation. KCSI argues nevertheless that the testimony of Bruening, that he did not follow the registration process and only remembers the problems with the Investment Company Act, shows that, notwithstanding his position as general counsel, his deposition statements were speculation and without probative value. There was affirmative testimony by Bruening, nevertheless, that Watson, Ess reported to him as general counsel about the registration process from time to time, and that as drafter of the Letter Agreement, he understood that a minority shareholder would want the registration to be accomplished expeditiously—if KCSI chose that option "to complete the process and attempt to sell his shares as soon as he could."

Moreover, in the argument of the point, KCSI suggests no prejudice from the admission of the deposition testimony. The reply brief argues that KCSI was prejudiced "by the false impression given to the jury that because Mr. Bruening did not know all the answers to the questions posed to him regarding the process of reg-

istration, the registration process was not being pursued diligently when, in fact, Bruening was not even charged with pursuing or monitoring it." A ground of error asserted for the first time in the reply brief does not present an issue for appellate review. *Wilner v. O'Donnell*, 637 S.W.2d 757, 764[11] (Mo.App.1982). The point is denied.

*Point XXII.*

KCSI contends it was error for the trial court to award Wulfing $74,647.20 in prejudgment interest on two grounds. First, the motion for award of prejudgment interest was untimely. We have determined that the case must be remanded for retrial on the issue of damages, therefore any award of prejudgment interest must await the entry of a new judgment, and any question of timeliness abides that event.

Second, prejudgment interest was not awardable because Wulfing's damages were unliquidated and unascertainable by any recognized standard. This issue is not made moot by our remand of the case for retrial of the issue of damages, but continues to inhere in any prospective money judgment awarded in the case.

■ The general rule is that in the absence of an agreement to pay interest, the law will imply damages for not discharging a debt when it ought to be paid. *Prudential Ins. Co. v. Goldsmith*, 239 Mo. App. 188, 192 S.W.2d 1, 3[2–5] (1945). Section 408.020 reflects these common law principles. In actions for breach of contract, interest ordinarily runs from the date of the breach or the time when payment was due under the contract. *Prudential Ins. Co. v. Goldsmith*, 239 Mo.App. 188, 192 S.W.2d at 3[2–5]; § 408.020, RSMo 1986. The purpose of the rule and statute is to give incentive for prompt payment of money obligations and to compensate the

creditor when the debtor fails to do so. *Komosa v. Monsanto Chem. Co.*, 317 S.W.2d 396, 399[3, 4] (Mo. banc 1958).

■ Interest is not allowed on unliquidated damages or demands until the rendition of judgment because a debtor who does not know the amount owed should not be considered in default for failure to pay. *Fohn v. Title Ins. Corp.*, 529 S.W.2d 1, 5[7, 8] (Mo. banc 1975). A claim is regarded as liquidated for the allowance of interest, however, where the amount of damage is readily ascertainable by computation or can be determined by reference to a recognized standard. *Killian Constr. Co. v. Tri–City Constr. Co.*, 693 S.W.2d 819, 829[8–11] (Mo.App.1985). In the determination of whether to award prejudgment interest, principles of fairness and justice are guides for the court. *Catron v. Columbia Mut. Ins. Co.*, 723 S.W.2d 5, 7 (Mo. banc 1987).

■ The order of the trial court made the prejudgment interest to accrue from March 9, 1988, the date Wulfing put his shares of LDX Group stock to KCSI.[15] Wulfing argues that prejudgment interest on a claim that is readily ascertainable by a recognized standard runs from the date of demand upon the other party to perform its obligations under the contract or, if no demand, from the date of his petition. He argues that the order of prejudgment interest was properly entered at the time he put his stock to KCSI. The argument continues that since the number of the shares, options and warrants he owned was undisputed, and the fair market value was calculable by the recognized methods described by expert Korschot, the court was left with no discretion but to award prejudgment interest.

■ The argument is mistaken in both premises. Section 408.020 grants to a creditor interest:

15. That date is palpably incorrect, all other considerations apart, because under the put provision, KCSI was not required to act for sixty days upon either option, the purchase of the shares or to cause LDX Group to file as expeditiously as possible a registration statement. It was on March 29, 1988 that KCSI announced to the shareholders of LDX Group that Wulfing had

put his shares and that KCSI had elected the registration option under the put provision. Thus even under the theory applied by the trial court, that demand upon the defendant contractee to perform its obligations under a written contract initiates accrual, prejudgment interest did not begin to run before March 29, 1988.

... when no other rate is agreed upon, for all moneys *after they become due and payable, on written contracts,* and on accounts after they become due and demand of payment is made ... [emphasis added.]

The premise that in a claim for money damages for breach of a written contract, demand upon the contractee initiates accrual of prejudgment interest is found in neither § 408.020 nor in our authoritative decisions.[16] Nor can Wulfing's damages be readily ascertained by computation or by reference to a legal or recognized standard.

The damages returned to Wulfing were on the theory of the breach by KCSI of its obligation under the put provision of the Letter Agreement. [The damages returned by the jury also included the loss of profit that would have been realized from the exercise of the options and warrants.] The premise of the alternatives that paragraph (1)(B) of the Letter Agreement grants KCSI to either purchase the shares at their fair market value as determined by independent investment banker appraisal or to cause them to be registered as expeditiously as possible with the SEC so as to permit public sale is that a "regular trading and a publicly quoted market price for the Shares does not exist."

Thus, the method to determine the value of the shares and hence damages for the loss of value from the breach of the obligation was itself a matter of contract. Implicit in the determination of the value of shares that are not regularly traded and for which a publicly quoted market price

does not exist, is that the value cannot be reasonably ascertained until the shares are registered and then sold. Or, under the peculiar obligation of the put provision, until the shares could have been registered as expeditiously as possible under the circumstances. It is then that the damages for the failure to register expeditiously become ascertainable, if at all, and it is then that KCSI comes under the legal duty to liquidate the sum due. *Komosa v. Monsanto Chem. Co.,* 317 S.W.2d at 400[3–4]. It is then, also, from the date when the right to recover a sum certain is vested in the plaintiff, that interest allowed as damages begins to run. *Prudential Ins. Co. v. Goldsmith,* 239 Mo.App. 188, 192 S.W.2d at 3[2–5]; *Ohlendorf v. Feinstein,* 670 S.W.2d 930, 935 (Mo.App.1984).

The damages remain to be ascertained. The jury award rests on improper evidence, the claim of loss from the options and warrants, and damages must be readjudicated. It may yet be that the jury will find that, although KCSI breached the obligation to register the Wulfing shares as expeditiously as possible, nevertheless there was no damage. There was evidence that at the date that expeditious registration could have been reasonably accomplished [June 1988 by expert Granda's testimony] the LDX Group shares were without value. The issue remains whether Wulfing was damaged and by how much. Thus the damages are not liquidated and interest cannot accrue until then. *Ohlendorf v. Feinstein,* 670 S.W.2d at 935.

16. In a claim on a written contract § 408.020 makes prejudgment interest to accrue on "moneys after they become due and payable." In an action for breach of contract "interest ordinarily runs from the date of the breach or the time when payment was due under the contract." *Prudential Ins. Co. of America v. Goldsmith,* 239 Mo.App. 188, 192 S.W.2d at 3[2–5]. A demand is not material to the right to legal interest under the statute in a claim for the payment of money based entirely on a written contract. *Larson v. Crescent Planing Mill Co.,* 218 S.W.2d 814, 822[10] (Mo.App.1949). The demand statute imposes as essential to recover interest on unwritten accounts has no application to the right to interest on written accounts or contracts. *Weekley v. Wallace,* 314 S.W.2d 256, 257[1–4] (Mo.App.1958).

Wulfing's insistence that "[p]rejudgment interest plainly runs from the date of demand or the date of filing if no demand is made," rests on *General Aggregate Corp. v. La Brayere,* 666 S.W.2d 901 (Mo.App.1984). *General Aggregate Corp.,* however, was not a claim on written contract, but on quantum meruit, and hence under the *demand* condition of § 408.020.

The terminology of *demand* as a condition to allowance of prejudgment interest in a claim on a written contract appears in a spate of decisions, not as a reading of § 408.020, but on the authority of the court to adjudicate prejudgment interest *on any claim* without a request "demand" in the petition for such an award. *See, e.g. Folk v. Countryside Casualty Co.,* 686 S.W.2d 882, 884[5] (Mo.App.1985); *General Aggregate Corp.,* 666 S.W.2d at 910[12–14].

Wulfing cites cases to the effect that KCSI cannot defeat his claim to prejudgment interest by simply disputing the value of the shares [options and warrants]. The issue is not simply the value of the shares, but whether they have value at all. We may assume that the registration of the shares with the SEC to permit public sale is a recognized mechanism to determine the fair market value of the shares. That is the legal standard to determine value which Wulfing and KCSI adopted by contract. That standard, however, is inherently indeterminate of value as applied to shares offered publicly for the first time, since there may be no buyer.

The very nature of the evidence that makes proof possible at all under the singular circumstances of this case, and to which Wulfing himself resorts to fix the date of the breach of the obligation to register as expeditiously as possible, adds to that indeterminacy. Wulfing cites the cross-examination testimony of KCSI's expert Grant that the registration process could have been completed in May of 1988. That opinion was rendered on the basis of assumptions the cross-examination posited to him. They were assumptions, Grant commented, "of a whole bunch of things that I cannot assume because they wouldn't have taken place, but if I am to make all the most favorable assumptions no matter how unrealistic, the process could have been completed in that time frame." To fix the date of the breach, Wulfing cites also the testimony of his expert, Granda, that the LDX Group stock registration should have gone effective in June 1988 or July 1988. He acknowledged on cross-examination nevertheless that the SEC would be particularly cautious in registering a company with a negative net worth, because the role of the SEC is to protect the investing public. The necessary import of that acknowledgment is to modify Granda's opinion of the effective date for an expeditiously accomplished registration beyond July 1988.

This is not to disparage the submissibility of Wulfing's theory of recovery. It is only to say that a jury verdict for Wulfing liquidates the damages but does not fix the date of the breach of the KCSI obligation to register the stock where the standard to measure the damages does not, and the evidence cannot. In the circumstances before the jury and under the proper evidence, KCSI still does not know what it owes Wulfing and so cannot be considered in default for not having paid. *Herberholt v. DePaul Community Health Center*, 648 S.W.2d 160, 162[1, 2] (Mo.App.1983). Since it is the jury verdict that will liquidate any damages returned, interest runs from the date of the judgment entered on the verdict.

*Point XXIII.*

The point contends that the trial court erred in awarding Wulfing $17,575.35 in costs because it included costs of depositions taken in Kansas City Southern Industries, Inc. v. Barnard, No. CV87–29822. The principal claim of that suit is identical to Wulfing's claim and Barnard was represented in that suit by Wulfing's counsel. The depositions taken in the Barnard case, Wulfing's brief asserts, were used by both sides in the litigation before us. KCSI argues that Wulfing did not show the relevancy of the Barnard deposition to this litigation and so the deposition costs were not proven under § 492.590, RSMo (Supp. 1990) It is enough to say that Wulfing no longer has a judgment for damages, and so may not recover his costs. *Haley v. Byers Transp. Co.*, 394 S.W.2d 412, 417[10, 11] (Mo.1965). Upon the remand, retrial and judgment, costs will be reassessed according to Rule 77.01.

*Point XXIV.*

■ KCSI next argues that the trial court erred in the denial of its motion for summary judgment and motion for directed verdict because, as a matter of law, KCSI caused the LDX Group stock to be registered as expeditiously as possible. An order overruling a motion for summary judgment is interlocutory and not appealable. *Gillespie v. Gillespie*, 634 S.W.2d 493, 494 (Mo.App.1982). It was a jury issue under all of the evidence already counted and recounted whether KCSI performed its registration obligation under the Letter Agree-

ment. The jury found that issue against KCSI and that adjudication stands.

*Point XV.*

The final point contends that the cumulative effect of the errors cited against the trial court had a prejudicial influence on the verdict rendered by the jury. We have determined prejudice from the ruling of the trial court that allowed the evidence of loss of profits from the options and warrants to be argued to the jury under the damage instruction. There was no other prejudice demonstrated by KCSI.

The award of damages is set aside and the cause is remanded to the circuit court for retrial on the issues of damages only.

All concur.

## APPENDIX A

### LETTER AGREEMENT DATED
### JUNE 21, 1985

. . . .

1. KCSI agrees, upon sixty (60) days prior written notice by you to KCSI of your desire to sell Shares to KCSI, that it will do the following:

 A. . . . .

 B. In the event that there is not regular trading and a publicly quoted market price for the Shares does not exist, upon receipt of the aforementioned 60–day notice, KCSI, at its option shall (i) cause LDX to file (as expeditiously as possible) a registration statement with the Securities Exchange Commission and shall cause the same to become effective so as to permit public sale of your Shares or (ii) purchase the Shares, at fair market value. If KCSI shall purchase the Shares, the parties shall endeavor, in good faith, to agree on the fair market value for the Shares to be purchased and, if the parties fail to agree on the fair market value within 15 days after receipt by KCSI of written notice of your desire to sell, the parties shall each appoint a representative, each of which representatives shall be a nationally recognized

investment banking firm which has not had a substantial business relationship with the party so appointing it. Not less than 40 days after their appointment the representative shall determine, in good faith and in their independent professional judgment, the fair market price for the Shares. In the event the fair market value of the Shares as determined by the representatives is different, the price of the Shares shall be deemed to be an amount equal to the average of the amounts so determined by the representatives and shall be final and binding on you and KCSI.